**Thomas J. CLEARY by his next friend, Carolyne Cleary, and Carolyne Cleary individually, on their own behalf and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**William WALDMAN, in his official capacity as Commissioner of New Jersey Department of Human Services, Leonard Fishman, in his official capacity as Commissioner of New Jersey Department of Health and Senior Services, Velvet G. Miller, in her official capacity as Director of Division of Medical Assistance and Health Services, and Mark Schiffer, in his official capacity as Director of Passaic County Board of Social Services, Defendants.**

Civil Action No. 96–4774 (DRD).

United States District Court,
D. New Jersey.

Feb. 25, 1997.

Feldman & Feldman by Paul L. Feldman, Stephen A. Feldman, Ellen R. Wase, Beth Lovitch, Marlton, NJ, for Plaintiffs.

Peter Verniero, Attorney General Of New Jersey, R.J. Hughes, Justice Complex by Meredith Van Pelt, Deputy Attorney General, Trenton, NJ, Charles A. Miller, Covington & Burling, Washington, D.C., for Defendants William Waldman, Leonard Fishman, Velvet G. Miller and Mark Schiffer.

Fox, Rothschild, O'Brien & Frankel, Lawrenceville, NJ, for Intervenor, New Jersey Association of Health Care Facilities.

Jonathan D. Weiner, R. James Kravitz, Maureen E. Kerns, on the brief, Dechert Price & Rhoads by Bruce W. Clark, Kara W. Swanson, Princeton, NJ, for Intervenor New Jersey Association of Non–Profit Homes for the Aging; Jonathan D. Weiner, of counsel.

### *OPINION*

DEBEVOISE, Senior District Judge.

Plaintiff, Thomas J. Cleary, is an "institutionalized spouse" (as defined in 42 U.S.C. § 1396r–5(h)(1)) residing at The Health Center at Bloomingdale in Bloomingdale, New Jersey. Plaintiff, Carolyne Cleary, Mr. Cleary's wife, is a "community spouse" (as defined in 42 U.S.C. § 1396r–5(h)(2)) and resides in Butler, New Jersey.

The defendants are William Waldman, Commissioner of New Jersey Department of Human Services; Leonard Fishman, Commissioner of New Jersey Department of Health and Senior Services; Velvet G. Miller, Director of Division of Medical Assistance and Health Services; and Mark Schiffer, Director of Passaic County Board of Social Services.

Plaintiffs seek to represent a class composed of all persons who:

(a) were, or in the future would be, admitted to New Jersey nursing facilities, as "institutionalized spouses" within the meaning of the Social Security Act, or were, are, or in the future would be "community spouses" within the meaning of the Social Security Act; and

(b) did not, or in the future would not, receive, upon admission to the facility, both oral and written notice of the requirements and procedures for establishing eligibility for medical assistance, including the right to request an assessment and to establish an amount necessary to provide a minimum monthly maintenance needs allowance. There is a subclass of individuals, represented by Named Plaintiffs Thomas and Carolyne Cleary, who also:

(c) were not, or in the future would not be, adequately or correctly notified of their right to increase the "community spouse resource allowance" as part of the Medicaid application process; and,

(d) unnecessarily diminished, or in the future would unnecessarily diminish, needed income producing assets due to this lack of information; and subsequently

(e) were not, or in the future would not be, allowed to increase the "community spouse resource allowance," because of Defendant's impermissible and therefore unconstitutionally restrictive application of federal law.

In this action plaintiffs challenge the interpretation of portions of the Medicare Catastrophic Coverage Act of 1989 (the "MCCA"), 42 U.S.C. § 1396r–5, which provide for the allocation and distribution of income and assets between institutionalized and community spouses for the purpose of deciding if the institutionalized spouse is Medicaid eligible. Plaintiffs have moved for an order preliminarily enjoining defendants (i) from continuing practices which violate notice provisions of the Social Security Act 42 U.S.C. § 1396, et seq., and (ii) from continuing to implement New Jersey's "income first rule" when determining when an institutionalized spouse becomes Medicaid eligible.

Two organizations have moved to intervene. The New Jersey Association of Health Care Facilities (the "NJAHCF") which includes among its members more than 200 of the State's 352 nursing facilities, and the New Jersey Association of Non–Profit Homes for the Aging (the "NJANPHA"), which is an association of more than 130 non-profit New Jersey facilities for the elderly. Each of these associations asserts that the relief plaintiffs seek would cause a significant reduction in monthly payments to them and subjects them to the risk of suits by residents of their facilities for restitution for past overpayments under the state regulatory structure which plaintiffs allege is unlawful.

## I. The Intervention Motion

■ Both parties moving to intervene (referred to collectively as the "intervenors") are non-profit organizations which serve the interests of their constituent nursing homes. Each asserts that abandonment of New Jersey's income first regulations would have a devastating impact upon their members and would subject them to law suits by Medicaid recipients to recover payments made pursuant to the State's income first regulations.

The income first rule will be dealt with in more detail in subsequent parts of this opinion, but a brief description of its role in New Jersey's Medicaid program is necessary in order to understand the nature of the intervenors' interests.

The MCCA designates as the community spouses' minimum monthly maintenance needs allowance (the "monthly need") a sum sufficient to enable the community spouse to live independently in the community above the poverty level.

The MCCA also allows the community spouse to retain marital assets known as the community spouse resource allowance (the "resource allowance").

In the present case plaintiffs had combined assets of $248,428.80 at the time Mr. Cleary first entered a nursing home. The county agency handling his Medicaid application found that Mrs. Cleary's resource allowance was $76,740, based upon a formula authorized by the federal statute. It also found that her monthly need was $1,524.50, and that this would be provided by i) $516.50 which she received from Social Security, ii) $311.75 in the form of interest (at 5%) on her $76,740 resource allowance, and iii) $696.25 from her husband's income. Subsection (d) of MCCA provides in effect, that after the institutionalized spouse's eligibility is determined, any deficit in the community spouse's monthly need will be applied to her from the

institutionalized spouse's income before it is applied to the institutionalized spouse's medical care expenses.

When the county agency made this determination approximately $180,000 of plaintiffs' assets remained, the rest having been used for nursing home charges and other expenses. The institutionalized spouse, Mr. Cleary, would not be eligible for Medicaid until he had spent down the remaining assets to an amount equal to $2,000 plus $76,740 which would be payable to Mrs. Cleary as her resource allowance. While the spending down process continued Mr. Cleary would remain a private patient in his nursing home paying private patient rates of approximately $6,000 a month. When he became Medicaid eligible, the nursing homes would be required to accept the Medicaid reimbursement rate, an amount well below the costs of his care.

Plaintiffs contend that under subsection (e)(2)(C) of MCCA Mrs. Cleary was entitled to a resource allowance of $243,780 rather than $76,740. The subsection provides:

> If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance.

It is plaintiffs' position that the $696.25 from Mr. Cleary's income cannot be counted as Mrs. Cleary's income when making the subsection (e)(2)(C) calculation, and that as a result her resource allowance must be increased by $167,040, an amount which, when invested, would produce income of $696.25 per month.

If Mrs. Cleary's total resource allowance were $243,780 ($76,740 plus $167,040), Mr. Cleary would be entitled immediately to

Medicaid assistance, and during the period when he otherwise would have been paying the nursing home $6,000 a month the nursing home would have been paid the much lower Medicaid monthly rate.

Both intervenors assert that application of the resource first rule advocated by plaintiffs in place of the State's income first rule would have a devastating effect upon their member nursing homes and would inevitably have an adverse impact upon care for the institutionalized elderly in New Jersey.

In their complaint plaintiffs estimate that if the resource first rule were adopted approximately 10,000 New Jerseyans would become immediately Medicaid eligible, swelling the State's rolls and changing reimbursement received by nursing facilities from private payers rates to the Medicaid rate. The intervenors estimate that the financial impact would amount to approximately $66 million per year.[1]

Further, if it were held that the income first method is invalid, there is the prospect that persons such as the Clearys might seek reimbursement from their nursing homes for excessive past payments. MCCA was implemented in 1989, and there is the spector of claims in the amount of $66 million for each year since that date.

NJAHCF includes among its membership more than 200 of the State's 352 nursing facilities. They are of a proprietary, non-profit and governmental structure.

NJANPHA is a state-wide association of more than 130 non-profit facilities for the elderly serving more than 25,000 persons each year. Catholic, Jewish and Protestant organizations sponsor two-thirds of NJANPHA's members, while county governments, fraternal organizations, private charities and other community groups serve the rest. Most of NJANPHA's members are nursing facilities, but they also include assisted living facilities, continuing care retirement communities, residential health care facilities and independent housing.

---

1. This figure probably over estimates the impact, because during the spend down process it is unlikely that the institutionalized spouse would spend all of his assets on nursing home care.

However, as in the case of the Clearys, people in that position would most likely pay a very substantial part of their assets to the nursing home.

By statute and regulation New Jersey's Medicaid nursing homes have an obligation to fill at least 45% of their beds with Medicaid patients, at a substantial loss per patient. To cover the loss the nursing homes must increase their rates to private patients. Presently the average private-pay census in the State's nursing facilities is 27% of the State's total nursing facility beds, with Medicaid patients occupying the balance. If the resources first rule were applied in New Jersey substantial numbers of private patients would immediately become Medicaid patients reducing even further the number of private-pay patients who have to carry the losses incurred as Medicaid patients. Further, in the future if spouses were able to shelter substantially more assets there would continue to be fewer private-pay patients who would have to shoulder an ever increasing share of nursing home costs.

The intervenors assert that they are entitled to intervene as of right pursuant to Fed.R.Civ.P. 24(a), and that in any event they should be granted permissive intervention under Rule 24(b). Plaintiffs resist the motions asserting i) that the intervenors' estimates of the economic impact of a resource first rule are "grossly exaggerated", ii) that they lack a sufficient interest in the litigation and iii) that they lack standing.

I conclude that the intervenors have met the requirements of Rule 24(a). As party seeking to intervene must shows that:

1. Its application is timely;

2. It has a direct interest in the subject matter of the litigation;

3. Its interests may be affected or impaired as a practical matter, by the disposition of the action; and

4. Its interest is not adequately represented by any existing party.

*Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir.), *cert. denied*, 484 U.S. 947, 108 S.Ct. 336, 98 L.Ed.2d 363 (1987).

It is undisputed that the intervenors' application is timely.

Standing and a direct interest in the subject matter of the litigation are related concepts. An association has standing if i) its members would otherwise have standing to sue in their own right; ii) the interests it seeks to protect are germane to the organization's purpose; and iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

Individual nursing homes would have a right to intervene in this action. It affects their vital interests. Contracts which they have with private patients could be affected if plaintiffs' position prevails. They might find themselves subject to suits for restitution of payments which patients made while the State's income first rule was in effect. Further, the relief which plaintiffs seek in their Count I is an order directing the State to take regulatory action against nursing homes. Thus the individual members of the intervenors would have standing to intervene in their own right.

Obviously the interests which the intervenors seek to protect are germane to their organizational purposes—the financial well-being and the general effectiveness of their members. They can seek to protect their interests in this lawsuit without the participation of individual members. Thus the intervenors have standing and by the same token have a direct interest in this litigation.

The interests of the intervenors may well be affected or impaired as a practical matter by the outcome of this litigation. The consequences of a declaration that the State's income first policy violates MCCA have been described above. There would be immediate financial consequences and there would be a strong likelihood that individual nursing homes would be sued for reimbursement.

The present parties to the litigation are all governmental agencies. Many of their interests parallel those of the intervenors' members. However, in some important respects they diverge. By virtue of the Eleventh Amendment the State defendants are immune from suits for money damages and have no incentive to consider the retroactive effect of a judgment. This could affect their litigation strategy and their strategy during possible settlement negotiations.

I conclude that the intervenors have met the requirements of Rule 24(a). Even if they were not entitled to intervene as of right, in the exercise of the court's discretion they should be permitted to intervene pursuant to Rule 24(b). Their claims and defenses have significant questions of law in common with those of the main action. Their presence would not delay the action or prejudice the rights of the parties. They are vital participants in the program to provide medical care to the elderly and to the indigent. Their perspective is an important one and should have a voice when issues critical to their well-being and to the well-being of the Medicaid program in New Jersey are being decided. Their motions to intervene will be granted.

## II. *The Facts*

The historical facts as set forth in the complaint and as amplified by affidavits are not in dispute.

Mr. Cleary is 79 years of age and suffers from Parkinson's Disease with dementia. He was admitted to Morris Hills Multicare Center on or about November 21, 1995. On January 23, 1996 his family transferred him to the Health Center at Bloomingdale. Upon admission to the nursing home in 1995 he became an "institutionalized spouse" pursuant to the Social Security Act and his wife became a "community spouse." 42 U.S.C. § 1396r–5(h).

At the time of Mr. Cleary's 1995 admission the couple's combined "countable" resources (which excluded the value of the family home) amounted to approximately $248,-428.80. Of this amount $48,340 was spent for Mr. Cleary's nursing home care through August of 1996.

In July 1996 Mrs. Cleary applied to the Passaic County Board of Social Services ("BSS") for Medicaid benefits on behalf of Mr. Cleary. She also requested that BSS prepare a resource assessment of the total value of the couple's joint resources at the time of Mr. Cleary's initial institutionalization.

On July 26, 1996 the eligibility worker assigned to the case informed Mrs. Cleary's counsel that the BSS planned to keep the file open for 180 days and refused to issue a resource assessment at that time. Upon being advised by counsel that BSS was required under New Jersey regulations to make an assessment and a Medicaid eligibility assessment upon request, BSS issued an assessment and denial of eligibility. Ultimately it determined that the couple's countable resources at the time of Mr. Cleary's initial institutionalization totalled about $240,000 (to which later discovered life insurance policies' cash surrender values aggregating $8,428.80 should be added). By the time of Mr. Cleary's subsequent application for Medicaid this amount had been reduced to approximately $180,000.

The BSS determined that Mrs. Cleary could retain a spousal allowance of $76,740 of the joint resources and that Mr. Cleary would have to spend the remaining non-exempt resources of approximately $103,000 down below $2,000 before he would be eligible for Medicaid.

Plaintiffs contend that the BSS incorrectly informed them that the amount protected for the community spouse was $76,740, because, in accordance with the statute, the community spouse resource allowance as at that date was i) $15,348, ii) an amount computed under a statutory formula—$76,740 in the present case, iii) *an amount established pursuant to a fair hearing,* or iv) an amount transferred under a court order. 42 U.S.C. § 1396r–5(f)(2)(A). For the reasons set forth below, plaintiffs contend that a fair hearing would have established that Mrs. Cleary's community resource allowance was greatly in excess of $76,740.

According to plaintiffs' calculations Mrs. Cleary receives a monthly social security payment of $516.50. Her spousal allowance of $76,740 would earn $311.74 in interest (assuming a 5% rate of return). Her monthly needs allowance is $1,524.50 (including excess shelter costs). This exceeds her total monthly income by $696.25 per month. According to plaintiffs they are entitled to an upward revision of the community spouse resource allowance pursuant to the provision of subsection (e)(2)(C) in an amount which will produce the additional $696.28. Assuming a 5% return, the income would be $167,-

040, which, together with the originally calculated spousal allowance would produce a total allowance of $243,780. The countable resources were $248,428, and Mr. Cleary would only have had to spend down $3,000 in resources before becoming eligible for Medicaid.

New Jersey has adopted the so-called "income first rule." Pursuant to this rule the hearing officer, in determining whether to allocate additional resources to Mrs. Cleary, would first consider whether a transfer of income from Mr. Cleary would enable her to meet the monthly need, given her income and the income from the $76,740 share of resources. Mr. Cleary receives more than $1,000 per month in Social Security benefits, and, of course, pending medicaid eligibility he will receive whatever income his share of the unused countable resources produces. His Social Security benefits alone are sufficient to provide Mrs. Cleary with the additional income to which she is entitled both before and after he becomes entitled to Medicaid assistance. If Mr. Cleary dies before Mrs. Cleary, Mrs. Cleary's Social Security payments would increase from $526.50 to $1,101.50 and her total income would be $1,413.25, including the income generated by her standard resource allowance. This would be $111.25 short of her monthly need. The defendants assert that this is the short fall which should be addressed at a hearing pursuant to subsection (e)(2)(C).

Thus the principal issue in this case is whether New Jersey's income first regulation violates the Social Security Act.

III. *Discussion*

█ In order to obtain a preliminary injunction pursuant to Fed.R.Civ.P. 65 plaintiffs must establish that they have a reasonable probability of succeeding on the merits in the litigation and that they will be irreparably injured if a preliminary injunction is denied. Further the court must consider the harm to other persons from the granting or denial of the injunction, and the court must consider the public interest. Attention will first be directed to the likelihood of plaintiffs succeeding on the merits.

Plaintiffs note, correctly, that as at the applicable date the amount to be protected for Mrs. Cleary is the *greatest* of i) $15,348, ii) an amount computed under a statutory formula, i.e., $76,740, iii) an amount established pursuant to a fair hearing, or iv) an amount transferred under a court order. 42 U.S.C. § 1396r–5(f)(2)(A). At the time of application for Medicaid benefits, only the countable resources in excess of the community spouses' protected share are considered available to the institutionalized spouse to pay for care. 42 U.S.C. § 1396r–5(c)(2). Plaintiffs assert that in the present case the greatest of the four categories referred to in subsection (f)(2)(A) is the amount established pursuant to a fair hearing under subsection (e)(2)(C).

Subsection (e)(2)(C) provides that:

If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance.

At issue is what may be included in "the community spouse's income" within the meaning of subsection (e)(2)(C). The State contends that the statute permits it to consider any income which the husband can transfer to the wife to meet her needs before allowing the husband to transfer additional resources under subsection (e)(2)(C). The plaintiffs contend that only her personal income may be considered for subsection (e)(2)(C) purposes, and that the statute mandates a transfer of resources from the husband in an amount sufficient to generate income to make up any shortfall.

The Medicaid Act contains complex, interrelated provisions, and it would be foolhardy to impute a plain meaning to any of its provisions in isolation. A statute must be read as a whole; words depend upon context; "they have only a communal existence; and not only does the meaning of each interpene-

trate the other, but all in their aggregate take their purport from the setting in which they are used." *Tate & Lyle, Inc. v. CIR*, 87 F.3d 99, 104–05 (3d Cir.1996). Thus it is necessary to examine the origins and purposes of the MCCA as well as the structure and language of all of its provisions.

The Medicaid program, established in 1965 as Title XIX of the Social Security Act, is a joint federal-state program. One purpose is to enable the states to provide medical assistance to the aged "whose income and resources are insufficient to meet the costs of necessary medical services," including nursing home care. 42 U.S.C. § 1396, *et seq.* The states have considerable freedom to adopt standards for determining the extent of medical assistance, as long as such standards are reasonable and consistent with the objectives of the Act. Obviously no state can adopt programs which violate a mandate of the Act. *Monmouth Medical Center v. State of New Jersey*, 158 N.J.Super. 241, 249, 385 A.2d 1244 (App.Div.1978), *aff'd.*, 80 N.J. 299, 403 A.2d 487 (N.J.), *cert. denied*, 444 U.S. 942, 100 S.Ct. 297, 62 L.Ed.2d 308 (1979). Thus it is not necessarily impermissible for some states to adopt an income first rule when adjusting resource allocation and for other states to adopt a resource first method.

The New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D–1, *et seq.*, authorized New Jersey's participation in the Medicaid program.

The Secretary of the U.S. Department of Health and Human Services ("HHS"), through the Health Care Financing Administration ("HCFA"), administers the program at the federal level. At the state level, the administering agency is the Division of Medical Assistance and Health Services ("DMAHS") within the New Jersey Department of Human Services ("DHS"). N.J.S.A. 30:4D–4. The county welfare agencies assist DMAHS in processing applications for Medicaid and determining whether applicants have met the income and resource eligibility standards. N.J.S.A. 30:4D–7a; N.J.A.C. 10:71–3.15.

In order to be eligible for Medicaid, a person must not have available income or assets in excess of prescribed limits. Applicants with income or assets in excess of those limits must "spend-down" before becoming eligible. 42 U.S.C. § 1396a(a)(10), (17).

Prior to 1988 the eligibility rules governing spouses forced a couple to liquidate virtually all of their joint resources in order to qualify one of them for Medicaid. Frequently the community spouse was left with nothing on which to live. Further, after the institutionalized spouse became eligible for Medicaid, most of the couple's income had to be used to offset the cost of the institutionalized spouse's nursing home care.

In 1988 Congress addressed the problem of the impoverishment of individuals whose spouses resided in a nursing home and who received Medicaid benefits. This was the origin of the MCCA. Its primary purpose was "to end th[e] pauperization [of the community spouse] by assuring that [she] has a sufficient—but not excessive—amount of income and resources available" when the other spouse is institutionalized in a nursing home. H.R.Rep. No. 105(II), *supra*, 1988 U.S.C.G.A.N. at 888.

At the same time, however, Medicaid remained a program to provide care for the indigent and it was still necessary to protect the public from diversion of public funds from this overriding purpose. Under prior eligibility programs, based on the legal title principle, a couple whose financial position would normally not qualify them for federal assistance could shelter a majority of the resources in the wife's name, while the husband received medical care paid for by public funds. The 1988 amendments closed this loophole by attributing a certain amount of a couple's combined resources to the institutionalized spouse for eligibility purposes, regardless of the legal title. A balance was sought designed to prevent the non-institutionalized spouse from becoming impoverished and at the same time ensuring that no one escape contributing a fair share to the costs of nursing home care.

Different methods have been adopted by the states when implementing the spousal impoverishment provisions in the situation where the institutionalized spouse has both income and assets; i) an income first method,

ii) a resource first method, and iii) a hybrid method.

New Jersey has adopted the income first methodology whereby adjustments to the standard allocation of resources ($76,740 in the present case) in order to assure sufficient income for the community spouse can only be made after taking into account income transferred from the institutionalized spouse.

New Jersey regulatory provision governing "post-eligibility treatment of income" provides:

> If either (spouse) can establish at the fair hearing that the community spouse's share of the couple's resources is inadequate to raise the community spouse's income (*together with the community spouse maintenance deduction*) to the maximum authorized level, additional resources ... may be set aside for the community spouse. The amount of resources to be set aside shall be that amount that is determined sufficient to generate sufficient income to raise the community spouse's gross income to the maximum authorized level. (emphasis added)

N.J.A.C. 10:71–5.7(d).

Other states have adopted a resource first methodology, a methodology which plaintiffs contend is mandated by the MCCA. Under that procedure adjustments to the standard allocation of resources are made whenever the standard allocation generates insufficient income for the community spouse without regard to any permissible income transfer from the institutionalized spouse.

A hybrid approach used in some states leaves to the hearing officer's discretion whether to consider permissible income transfers before increasing the standard resource allocation.

Federal officials administering the Medicaid program have not adopted formal regulations interpreting the spousal impoverishment provisions, leaving to the states the decision whether to consider the institutionalized spouse's income, or solely his resources, in considering adjustments to the standard resource allowance. HCFA and the Secretary of HHS have stated in policy memoranda and in letters that subsection

(e)(2)(C) permits consideration of potential income transfers in determining whether the monthly needs amount will be met. These letters also note that a resource first approach is permissible but not mandatory under the statute. This is consistent with the nature of Medicaid as a cooperative federal-state venture in which states operate programs of their own design subject to federal standards and regulations.

Plaintiffs rely on the plain language of subsection (e)(2)(C). The subsection states that if the resource allowance "is inadequate to raise *the community spouse's income* to the minimum monthly maintenance needs allowance" additional resources shall be allocated to the community spouse. Plaintiffs argue that a transfer of a portion of the institutionalized spouse's income cannot be considered the "community spouses's income."

Subsection (e)(2)(C) can be understood only in the context of all of the provisions of MCCA. The first step, therefore, is to examine the statute as a whole and to ascertain how its various parts fit together.

Subsection (a), entitled "Special treatment for institutionalized spouses", emphasizes in various ways the limited nature of MCCA and its application only to the eligibility for medical assistance of institutionalized spouses. It states that its provisions supersede any other provisions of the subchapter concerning grants to states for medical assistance programs. MCCA deals separately with the spouses' income and with the spouses' assets ("resources"). Care must be taken not to apply definitions and provisions dealing with income to definitions and provisions dealing with resources, and visa versa.

First, as to income: Subsection (b) concerns the treatment of income of each spouse. It governs the determination of "the income of an institutionalized or community spouse for *the purposes of the post-eligibility income determinations described in subsection (d)*" (emphasis added). In short-hand terminology it incorporates a "name on the check" rule. With respect to non-trust property this is accomplished by a provision reading:

(i) if payment of income is made solely in the name of the institutionalized spouse or in the community spouse, the income shall be considered available only to that respective spouse;

(ii) if payment of income is made in the names of the institutionalized spouse and the community spouse, one-half of the income shall be considered available to each of them;

42 U.S.C. § 1396r–5(b)(2)(A). Thus for post-eligibility purposes each spouse is entitled to his or her own income.

Subsection (d), to which subsection (b)(2) refers, is entitled "Protecting income for community spouse." Subsection (d)(3) provides for the computation of the community spouse's monthly maintenance needs allowance ("monthly need"). This is an amount designed to ensure that the community spouse has an income significantly above the official poverty line.

Subsection (d)(2) defines the community spouse's monthly income allowance ("monthly allowance"). It is an amount by which:

(A) except as provided in [the notice and fair hearing subsection] the [monthly need] exceeds

(B) the amount of monthly income otherwise available to the community spouse

. . .

Subsection (d)(1) provides that after an institutionalized spouse has been determined to be eligible for medical assistance, in determining the amount of his income that is to be applied monthly to payment for the costs of his institutionalized care there shall be deducted the community spouse's monthly allowance to the extent it is made available to the community spouse. Thus to the extent that the community spouse's own income (determined as provided in Subsection (b)(2)) is insufficient to meet her monthly need, income of the institutionalized spouse (if he has any) is available to make up the difference.

The foregoing provisions of Subsection (b) and (d) relate to the allocation and use of the income of each spouse. Subsection (c), on the other hand, contains rules for the treatment of the resources of each spouse.

Total joint resources of the two spouses are computed as of the beginning of the first continuous period of institutionalization of the institutionalized spouse. 42 U.S.C. § 1396r–5(c)(1)(A). Under Subsection (c)(1)(B) upon the request of either spouse the state is required to assess and document the total value of the joint resources at the start of the first period of institutionalization. When providing a copy of the assessment the state is required to include a notice that the requesting spouse has a right to a fair hearing under subsection (e)(2).

Subsection (f)(2)(A) defines community spouse resource allowance (the "resource allowance"). The resource allowance is the greatest of i) $12,000 (adjusted annually), ii) the lesser of one-half total joint resources or $60,000 (adjusted annually), iii) an amount established pursuant to a fair hearing, or iv) an amount transferred under court order.

In the present case defendants contend that the community spouse resource allowance should be $76,740 computed pursuant to subsection (f)(2)(A)(ii). Plaintiffs contend that the resource allowance should be approximately $243,780, computed pursuant to a Subsection (e)(2) fair hearing under subsection (f)(2)(A)(iii).

The computations called for in subsection (f)(2)(A) control how much of the couple's total assets the community spouse is entitled to retain. Subsection (c)(2) of the rules for the treatment of resources provides that in determining the resources of the institutionalized spouse at the time of application for Medicaid benefit, *all* resources of both spouses shall be considered available to the institutionalized spouse to the extent that they exceed the community spouse resource allowance computed under subsection (f)(2)(A) as of the time of application for benefits.

Subsection (e)(2), to which reference is made in subsection (f)(2)(A)(iii), provides in subsection (e)(2)(C) that:

If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly maintenance needs

allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance.

The question which divides the parties is whether "the community spouse's income" is limited to her separate income as established in the rules for treatment of income contained in subsection (b)(2) or whether it includes her monthly allowance under subsection (d)(1)(B) (the amount by which the spouses's monthly maintenance needs allowance exceeds the amount of monthly income available to the community spouse).

The attribution of income provisions upon which plaintiffs rely (subsection (b)(2)) do not by their terms apply to allocation of resources which is the subject of subsection (e)(2)(C). They apply "[i]n determining the income of an institutionalized spouse or community spouse for purposes of the post-eligibility income determination described in subsection (d) ." Subsection (d) relates only to the protection of the community spouse's income. Included in that income, of course, will be any income produced by the community spouse's resource allowance.

Thus the attribution of income provisions of subsection (b)(2), limited as they are to the income protection provisions of subsection (d), do not point to plaintiffs' interpretation of "income" as used in subdivision (e)(2)(C). That provision deals with resource, not income, allocation. In light of the detailed provisions of subsection (d) designed to make available to the community spouse as much, but only as much, of the institutionalized spouse's income as necessary to ensure her monthly need, it would be anomalous to construe subsection (e)(2)(C) in such a manner as to exclude the institutionalized spouse's income from the calculation and substitute for it resources which would provide the needed income to ensure that the community spouse received her monthly needs allowance.

Based simply on the language and structure of the MCCA I conclude that the "community spouse's income" as used in subsection (e)(2)(C) includes any community spouse monthly income allowance available to her pursuant to the provisions of subsection (d). This furthers MCCA's purpose of ensuring that the community spouse receives a minimum amount of income well above the poverty level. To accomplish this it is not necessary to create an endowment which not only provides the needed income but also creates a fund which can be passed on to the community spouse's heirs. This would subvert the other purpose of MCCA which is to require couples to bear a reasonable amount of the costs of institutionalized care and thus preserve Medicaid resources.

A pre-eligibility hearing is designed to ensure that the community spouse's monthly need will be met at the time of eligibility even after the resources have been spent down to the eligibility level. It is necessary to make a subsection (e)(2)(C) showing in advance of the eligibility date to ensure that sufficient resources are reserved to protect the community spouse's monthly need. However, to interpret the provision of subsection (e)(2)(C) to require exclusion of the community spouse's subsection (d) monthly income transfers from the institutionalized spouse would frustrate the design of the statute to provide for a transfer of assets only in an amount sufficient to ensure the community spouse's post-eligibility monthly income need and could, as in the present case, result in an unintended windfall to the community spouse and her heirs.[2]

I appreciate that other courts have reached a different conclusion. *State of Ohio ex rel. Robert Chambers v. Ohio Department of Human Services,* Civ. Action 2–94–1094 (So.D.Ohio 1995) (appeal pending); *Comis v. Bullen,* Civ. No. 94–4513 (Sup.Ct. Mass.1995). A difficult question is presented which ultimately will have to be decided at the appellate level.

**2.** Plaintiffs note that in some circumstances a community spouse's income may drop when the institutionalized spouse dies. For example aggregate Social Security payments may be less, as in the present case. This is a circumstance which could be considered at a subsection (e)(2)(C) hearing and adequate resources allocated to provide for that eventuality.

Each party in the present case relies on the legislative history to support its position. Citing the very same House and Senate bills and referring to the same conference committee proceedings they arrive at opposite conclusions. The legislative history of the particular subsection of MCCA at issue is not conclusive, but it tends to support defendants' position.

The *spousal impoverishment* provisions were originally set forth in H.R. 2470, the House bill that became the MCCA. The house bill did not contain any option to increase the standard resource allowance to meet the monthly need amount. The sources available under H.R. 2470 to meet the monthly need were i) the community spouse's own income, ii) any income generated by the standard resource allowance, and iii) transfers of income from the institutionalized spouse (the "community spouse monthly income allowance").

The Senate bill, S.1127, was modeled after the House version but added a provision that would have reduced the resources available to the institutionalized spouse by an amount necessary to generate the monthly need of the community spouse (after counting her own income), without regard to any income of the institutionalized spouse that might be transferred to the community spouse in order to provide her monthly need. Plaintiffs contend that Senate bill S.1127 reflects the meaning of MCCA as finally enacted. The Senate bill also contained a provision granting a hearing to consider increasing either the monthly need allowance of the community spouse or the community spouse resource allowance if they were otherwise inadequate to support the community spouse without financial duress.

The Conference Committee adopted neither the House nor the Senate version. It moved beyond the House bill to provide for an adjustment of the resource allowance, if necessary, to increase the wife's income to the monthly need level. But the Conference Committee, unlike the Senate's bill, did not accomplish this result by "exclud[ing] from countable resources those assets necessary to produce income available to the community spouse—"H.R.Conf.Rep. No.661, 100th

Cong.2d Sess. 265(1988). The Committee's version authorized the fair hearing that is embodied in subsection (e)(2)(C).

Plaintiffs contend that inclusion of the fair hearing provision carried with it the Senate bill's requirement that there be excluded from countable resources those assets necessary to produce income available to the community spouse. This is a questionable leap of logic. More likely, if the conferees had intended to preserve the Senate bill's explicit direction it would have done so expressly. The conferees explained that in the hearing embodied in subsection (e)(2)(C) the state must allow the community spouse to retain an "adequate" amount of resources to provide the monthly need "taking into account *any* other income attributable to the community spouse." H.R.Conf.Rep. No. 661, *supra* (emphasis added). For the purposes of *resource* allocation (as distinguished from *income* calculations under subsection (b)), the community spouse monthly income allowance provided for in subsection (d)(1)(B) is certainly "income attributable to the community spouse."

Thus the legislative history points not to the construction of subsection (e)(2)(C) which plaintiffs urge. Rather it tends to support either defendants' position that the income first rule is required by the statute or perhaps the position of the responsible administrative agencies that the states have discretion to apply either the income first or resource first rule.

The position of the agencies charged with the administration of this important, complicated health care program is significant. The federal officials administering the Medicaid program have concluded that Congress has given the States authority to decide whether to consider the institutionalized spouse's income or solely his resources in considering adjustments to the standard resource allowance. This view has not been formalized in regulation, but has been stated in policy memoranda and in letters.

Were I to consider the question without the benefit of the views of these agencies, I might well interpret subsection (e)(2)(C) to require an income first approach.

However, under established principles, "[i]nherent in the powers of an administrative agency is the authority to formulate policies and to promulgate rules to fill any gaps left, either implicitly or explicitly, by Congress." *Tate & Lyle,* 87 F.3d at 104. Thus, a federal court should defer to the reasonable interpretation of a federal agency responsible for administration of the relevant program, whether or not the agency's interpretation is the only reasonable one. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *West v. Sullivan,* 973 F.2d 179, 185 (3d Cir. 1992) *cert. denied,* 508 U.S. 962, 113 S.Ct. 2934, 124 L.Ed.2d 684 (1993). Applying these principles requires a conclusion that New Jersey's income first method is at least a permissible application of the statute.

For the foregoing reasons I conclude that plaintiffs have not established a likelihood of success on the merits of the claims asserted in their second count, and the motion for an order preliminarily enjoining defendants from implementing its income first policies will be denied.

Plaintiffs also seek an order enjoining defendants from continuing practices which violate the notice provisions of MCCA. The state has a statutory obligation to enforce requirements imposed upon nursing homes to inform institutionalized persons and their spouses. The state also has a statutory obligation to prepare a notice of the rights of Medicaid patients. Plaintiffs allege, and defendants concede, that the state has not fully performed either obligation.

In response to the order to show cause the state has undertaken to review its process of surveying nursing homes and to ascertain whether the surveyors are enforcing nursing home notice requirements. The state is also reviewing the documents which it is responsible for preparing and will make such modifications as are necessary. It has undertaken to complete both phases of its corrective action within 30 days of the hearing on the preliminary injunction application.

In these circumstances an injunction is unnecessary. The application for injunctive relief with respect to notice requirements will be denied, but the denial will be without prejudice in the event that the state does not complete the corrective action described at the hearing.

Because plaintiffs are unlikely to prevail on the merits it is unnecessary to consider the other requirements for preliminary injunctive relief. Were these requirements to be addressed it would be necessary to evaluate the impact such an injunction would have upon nursing homes generally and upon the state's short term ability to provide institutionalized care for its elderly citizens. It would also be necessary to determine if in lieu of the immediate injunctive relief the plaintiffs seek on behalf of themselves and all others similarly situated, equitable considerations would require some form of phased transition from an income first to a resource first rule.

I shall file an order implementing this opinion.