Bellacosa, J.
(dissenting). My examination of New York State’s statutory and regulatory framework, as applied to this case, leads me to a vote to affirm.
The State statute and its corresponding departmental regulations emanate from the Federal financial font and stewardship of this vast field of Medicaid reimbursement. The New York State implementation warrants the conclusion that its Legislature has indicated its preference for a “resources first” approach to Medicaid eligibility affecting spouses in the situation presented here. Conversely, I discern no legislative authorization whatsoever for the “income first” method, invoked and used by the Social Services entities, in the particular case application, to narrow the eligibility for benefits to this couple (cf., Seittelman v Sabol, 91 NY2d 618, 626 [decided today]).
On my analysis, until a State change more definitively prescribes otherwise, case-by-case administrative applications ought to be bound by the enacted superior precepts — statute and regulation — indicating “resources first.” The bottom-line issue devolves here to statutory interpretation — a unique nondelegable judicial responsibility, framed within an individual administrative decision. Because the Monroe County Social Services Department and its State agency superintendent, on the fair hearing review, failed to harken to the superior authority sources, their actions were properly nullified by the Appellate Division.
L
The agencies rejected the application for Medicaid benefits for the payment of expenses incurred by Floyd Golf during two of the eight months when he was a resident at a Rochester nursing home. He died there in August 1993 at the age of 83.
In determining eligibility for Medicaid benefits, the Social Services entities must apportion resources and income, and *673 consider allowances as between the spouses (see, Social Services Law § 366-c [2], [5]). After calculating prescribed allocations, the agencies determined that Eileen Golfs monthly income did not meet the New York minimum monthly maintenance needs level of $1,769. To bring her up to the monthly minimum required, Monroe County Department of Social Services applied an “income first” accounting formula to allocate $389.94 monthly from, her husband’s Social Security and pension income. This occurred in 1993. The agency resolved that Floyd Golf was ineligible for Medicaid benefits based upon his savings resources of $13,100.11. Those resources were found to be in excess of the mandated $3,150 resource eligibility threshold and his $2,658.24 burial allowance.
After a fair hearing in 1994, the New York State Department of Social Services upheld the local agency’s denial of benefits. The decision theorized that the institutionalized spouse “was in receipt of more than enough income from [Social Security, pension, an insurance annuity and savings interest] to allocate to the Community Spouse in order for her to reach the MMMNA.” While State regulations specify that additional resources may be allotted to the community spouse to push her theoretical income up to the minimum level, “such is not necessary here, given the amount of other income available to her.” It concluded that the argument that “the Agency must use th[e] income generated by [Mr. Golfs] resources first cannot be accepted. Such language is not found anywhere in the regulations.”
By CPLR article 78 review, the widow sued for annulment of the agency’s determination. Supreme Court denied the relief in 1994, holding that the agency’s determination was not arbitrary or capricious because the pertinent statutes were “unclear that there is any particular way in which you must apply either the resources or the income” to calculate Medicaid eligibility.
The Appellate Division unanimously reversed and annulled the agency action (221 AD2d 997 [1995]). It held that based on New York’s statute and the agency’s promulgated regulations, “[t]he resources of the institutionalized spouse should be attributed first to raise the income of the community spouse to the level of the MMMNA before income from the institutionalized spouse is attributed to the community spouse” {id., at 997). I agree with that progressive method of calculation, and with the conclusion that flows from it, as now brought before this Court for review, through the final judgment rendered in 1997.
*674 IL
This Court has previously acknowledged that the purpose of the Medicare Catastrophic Coverage Act (42 USC § 1396r-5) is “ ‘to end th[e] pauperization [of the community spouse] by assuring that * * * a sufficient — but not excessive — amount of income and resources [are] available’ while the institutionalized spouse is in a nursing home at Medicaid expense” (Matter of Schachner v Perales, 85 NY2d 316, 323, quoting HR Rep No. 100-105 [II], 100th Cong, 2d Sess 65, reprinted in 1988 US Code Cong & Admin News 888; Matter of Gomprecht v Gomprecht, 86 NY2d 47, 51). This policy helps to minimize the “draconian results of the Medicaid rules” (Matter of Septuagenarian v Septuagenarian, 126 Misc 2d 699, 704). Indeed, “the primary focus of the legislation was to ensure that ‘[o]ur senior citizens should not live their golden years in the shadow of impoverishment’ ” (Matter of Schachner v Perales, supra, 85 NY2d, at 323, quoting Governor’s Approval Mem, L 1989, ch 558, 1989 McKinney’s Session Laws of NY, at 2415).
This spirit of helping New York’s elderly residents is also manifested in the legislative choice to provide maximum allowances permissible within the Federal charter (see, Governor’s Mem approving L 1989, ch 558, 1989 McKinney’s Session Laws of NY, at 2414-2415; see also, 42 USC § 1396r-5 [d] [3] [C]; [g]). Notably, this policy goal and implementation received the “strong! ] support” of the Department of Social Services (DSS) at the time of enactment (see, Mem of Commissioner of DSS, Bill Jacket, L 1989, ch 558, at 22-23).
Correspondingly, however, to preserve the public fisc and to guard against disproportionate sheltering or inappropriate dissipation of assets beyond the salutary purposes and resources of the Medicare Catastrophic Coverage Act, the State becomes an assignee of any third-party benefits as a prerequisite to eligibility (see, 42 USC § 1396k; Social Services Law § 366 [4] [h] [1]; 18 NYCRR 360-7.4 [a] [6]). The State may also recoup payments from responsible relatives (see, Social Services Law § 366 [3] [a]). Moreover, with its formidable procedural and litigation resources, the State may promptly pursue the estate of the institutionalized spouse for excess Medicaid benefits paid on behalf of that spouse (see, Pub L 103-66 § 13612 [1993]; see also, 18 NYCRR 360-4.10 [b] [5]; Matter of Craig, 82 NY2d 388, 390, 394). Whatever practicalities may circumscribe these tools, the governmental apparatus still always enjoys a potent upper hand over the supplicants for entitlements (compare, e.g., Seit *675 telman v Sabol, 91 NY2d 618, 626-627, n 2, supra [decided today]).
Importantly too, a State’s Medicaid program must conform to standards prescribed by the Federal statutes and regulations to qualify for national Medicaid funding (Matter of Schachner v Perales, 85 NY2d 316, 320, supra). Accordingly, in 1989, New York enacted Social Services Law § 366-c as this State’s counterpart to the spousal allowance provisions of the Federal Medicare Catastrophic Coverage Act (id., at 323; see, Matter of Gomprecht v Gomprecht, 86 NY2d 47, supra).
The pertinent language of the Federal statute provides that when the income generated by the community spouse resource allowance “is inadequate to raise the community spouses income to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance * * * an amount adequate to provide such a minimum monthly maintenance needs allowance [MMMNA]” (42 USC § 1396r-5 [e] [2] [C] [emphasis added]). The Federal structure thus contemplates and offers the choice to the States as to whether a threshold accounting calculation for eligibility should turn on an institutionalized spouse’s income or resources. The applied method and mathematics can have constricting and disparate repercussions.
Thus, we all acknowledge that, under the fair hearing provisions of the Federal statute, the States may opt either to allocate income or to attribute sufficient and available resources from the institutionalized spouse that would generate income usable by the community spouse to meet the minimum monthly maintenance needs allowance (see, Letter from Secretary Shalala, US Dept of Health and Human Servs, to Governor of State of Ohio [Mar. 28, 1995]; Mem of Director, Medicaid Bureau, US Dept of Health and Human Servs to All Regional Administrators [Mar. 3, 1994]; Gruber v Ohio Dept. of Human Servs., 98 Ohio App 3d 72, 81-83, 647 NE2d 861, 867-868; see also, Cricchio v Pennisi, 90 NY2d 296; see generally, Note, Spousal Impoverishment or Enrichment? An Assessment of Asset and Income Transfers by Medicaid Applicants, 4 Elder LJ 459 [1996]).
Other States have been confronted with this thorny problem under this labyrinthine web of statutes and local regulations. They, too, perceived correctly that a State may elect either “resources first” or “income first;” neither approach would violate or be inconsistent with the provisions or the underlying policy *676 of the Federal Medicaid structure (see, e.g., Cleary v Waldman, 959 F Supp 222 [D NJ]; Thomas v Commissioner of Div. of Med. Assistance, 425 Mass 738, 682 NE2d 874; Gruber v Ohio Dept. of Human Servs., 98 Ohio App 3d 72, 647 NE2d 861, supra; Kimnach v Ohio Dept. of Human Servs., 96 Ohio App 3d 640, 645 NE2d 825).
In some States, the critical fork in the road was taken unequivocally by antecedent State legislative direction (see, Cleary v Waldman, supra, 959 F Supp, at 228, 230; Thomas v Commissioner of Div. of Med. Assistance, supra, 425 Mass, at 742-745, 682 NE2d, at 877-878; compare, Kimnach v Ohio Dept. of Human Servs., supra, 96 Ohio App 3d, at 648, 645 NE2d, at 830). Thus, courts in those cases were faced with the question of assessing only whether their State’s particular legislative enactment conformed to the Federal authorization (see, Cleary v Waldman, supra, 959 F Supp, at 234; Thomas v Commissioner of Div. of Med. Assistance, supra, 425 Mass, at 745-746, 682 NE2d, at 879; Kimnach v Ohio Dept. of Human Servs., supra, 96 Ohio App 3d, at 649, 645 NE2d, at 831; compare, Gruber v Ohio Dept. of Human Servs., supra, 98 Ohio App 3d, at 83-84, 647 NE2d, at 869). This Court, therefore, is not dis-positively enlightened by the analysis in Cleary v Waldman (959 F Supp 222, supra), to which the majority significantly adverts (see, majority opn, at 664), where the New Jersey Federal nisi prius court’s decision was limited to whether that State’s adoption of an “income first” rule violated the Federal statute (see, Cleary v Waldman, 959 F Supp 222, 228, 230, supra). That is neither the issue nor the problem in the instant case.
Because the decisional features in the above-cited cases turned on the Federal statutory framework, they do not definitively answer the next, discrete level of problem with which this Court is now faced in this appeal; to wit, what has New York’s Legislature authorized?
My departure from the majority rationale, therefore, essentially derives from the different focus I perceive within New York State’s statutory enactment and promulgated regulation. I detect, for New York, a legislative preferential option in favor of a more generous and flexible eligibility based on the “resources first” method. That route, also, provides fairer notice to the cohort of regulated persons and more definitive and reliable guidance to the regulators and courts that are obliged to review administrative actions. Lastly, my approach would give greater deference in the distribution of governmental authority *677 to the more appropriate law- and policy- and eligibility-defining source — the Legislature and the agency in its formal rule promulgating role, as distinguished from its case-by-case decision making actions (see generally, Mikva and Lane, An Introduction to Statutory Interpretation and the Legislative Process, ch 1, § 5, at 46-50).
HI.
A.
Thus, I now try to pinpoint the key feature of my disagreement with the majority analysis, resulting in my different final destination — a vote for affirmance in favor of the party who should be eligible and entitled to benefits. Under my view of what the Legislature and the regulators actually said, New York’s local and State agencies lack the authority to trump a reasonably manifested legislative choice, with an agency-applied version of fiscal and policy preferences at the administrative case level. They are subordinate and cannot override the legislative prerogative, as fairly expressed and legitimately extrapolated from this complex universe. Nor can they interpose a policy of their own making, especially when the enacted words, such as they are, have been ratified and reinforced by promulgated regulations prescribing and pointing the way towards the “resources first” method, that preserves instead of disfavors eligibility.
This Court has analogously cautioned:
“An agency cannot create rules, through its own interstitial declaration, that were not contemplated or authorized by the Legislature and thus, in effect, empower themselves to rewrite or add substantially to the administrative charter itself’ (Matter of Tze Chun Liao v New York State Banking Dept., 74 NY2d 505, 510).
The instant case involves a more serious administrative arrogation of responsibility and power because it is the individual application decision that purports to “enact” a bureaucratic policy or set of standards, over the promulgated regulation and approved statute.
New York State has declared that:
“If either spouse establishes that income generated by the community spouse resource allowance, established by the social services district, is inade *678 quate to raise the community spouse’s income to the minimum monthly maintenance needs allowance, the department shall establish a resource allowance for the spousal share of the institutionalized spouse adequate to provide such minimum monthly maintenance needs allowance” (Social Services Law § 366-c [8] [c] [emphasis added]).
To my mind and eye, these words help to evince a sufficiently plain expression, choice and signal for “resources first.” Thus, the language of the New York statute and regulations should not be characterized as “functionally” or “virtually” identical to the concededly noncontrolling Federal fountainhead as to the issue at hand (see, majority opn, at 662, 667). Rather, the discretely nuanced jargon of the field of high specialization ought to be accorded some meaning, as is required under ordinary canons of statutory construction. Similarly, the absence of an explicit prohibition against the use of income first computation method (see, majority opn, at 665) should not prevail over the relatively more significant absence of legislative authorization for the threshold eligibility prerequisite itself.
Lawyers, bureaucrats and diplomats can almost always discern, parse and craft ambiguities. That professional training and skill, however, does not justify a deviation from a reasonably limited empowerment and plain reading of a complex statute, especially in the brighter illumination of particular and complementary regulations.
Those corresponding regulations, promulgated by the State Department of Social Services, buttress the interpretation I see in the statutory language. They also restrict the local agency’s options against doing whatever it pleases to reduce eligibility, with potentially widely varying and disparate results. The regulations even attempt to clarify the statutory distinction between treatment of resources and income for purposes of Medicaid eligibility. For example, they provide that:
“If either spouse establishes that income generated by the community spouse resource allowance * * * is inadequate to raise the community spouse’s income to the [MMMNA], the department must establish resource allowance adequate to provide such [MMMNA] from those resources considered to be available to the institutionalized spouse” (18 NYCRR 360-4.10 [c] [7] [emphasis added]; contrast, *679 18 NYCRR 360-4.10 [b] [6]; Social Services Law § 366-c [8] [b]).
The resource allowance required under section 366-c (8) (c) of the Social Services Law is thus limited to “those resources considered to be available to the institutionalized spouse” (see, 18 NYCRR 360-4.10 [c] [7]). Resources “available” to the institutionalized spouse include “all resources, including resources required to be considered in determining eligibility * * * held by either the institutionalized spouse or the community spouse, or both, * * * to the extent that the value of the resources exceeds the maximum community spouse resource allowance” (18 NYCRR 360-4.10 [c] [2]).
B.
Critically, in my view, no income allocation from the institutionalized spouse to the community spouse prior to eligibility is authorized or directed under the New York statute (see, Social Services Law § 366-c [3], [4]). Before eligibility is determined, the department is authorized to “substitute an amount adequate to provide additional necessary income from the income otherwise available to the institutionalized spouse” only when a community spouse’s needs exceed the MMMNA because of “exceptional circumstances which result in significant financial distress” (Social Services Law § 366-c [8] [b] [emphasis added]; 18 NYCRR 360-4.10 [b] [6] [emphasis added]; see, Social Services Law § 366-c [2] [d] [iii]; contrast, Social Services Law § 366-c [8] [c]; 18 NYCRR 360-4.10 [c] [7]; 42 USC § 1396r-5 [e] [2] [C]).
It must be pointed out that the majority misapprehends my citation to and distinguishment of Social Services Law § 366-c (8) (b) (see, majority opn, at 670). The section is included for its instructional value in demonstrating that there are circumstances in which the Legislature of this State envisioned and expressly authorized a transfer of preeligibility income when exceptional circumstances result in need beyond the MMMNA. Thus, the corresponding prohibition of a preeligibility income transfer — as I see it — to satisfy the MMMNA threshold is affirmatively reflected by the requirement of resource transfers in the succeeding subdivision (8) (c) of Social Services Law § 366-c. That is my sole comparative point in that regard, not the characterization the majority attributes to it.
When, however, the income generated by the community spouse’s resources fails to satisfy the MMMNA minimum threshold, as happened here, the New York statute expressly *680 mandates then that “a resource allowance * * * adequate to provide such [MMMNA]” shall be established from the institutionalized spouse’s available resources (Social Services Law § 366-c [8] [c] [emphasis added]; see, 18 NYCRR 360-4.10 [c] [7]; contrast, 42 USC § 1396r-5 [e] [2] [C] [authorizing substitution of “an amount adequate to provide such (MMMNA)”]; see also, Assembly Mem in Support, Bill Jacket, L 1989, ch 558, at 6). While this may be a troublesome and obscure aspect within the analysis of this case, I believe that if someone must bear the burden of confusion and ambiguity, it ought not be the otherwise eligible recipient of a joint Federal-State helping hand program.
C.
I respectfully submit, therefore, that the majority unnecessarily countenances the agencies’ more restrictive view. They treat the “community spouse’s income” as used in Social Services Law § 366-c (8) (c) as inclusive of income attributable to the community spouse under Social Services Law § 366-c (3), the income generated by resources attributable to the community spouse under Social Services Law § 366-c (5), plus a “community spouse monthly income allowance” (CSMIA) under subdivision (2) (g). Instead, it appears sufficiently plain to me from the statute — and fairer — that the CSMIA should be used to satisfy a deficit in the community spouse’s MMMNA, only after eligibility of the institutionalized spouse has been determined. Because, therefore, the CSMIA should not be included in “the community spouse’s income” prior to eligibility, the only initial source to satisfy this shortfall should be the institutionalized spouse’s resources.
Although CSMIA is intended to satisfy a gap between the MMMNA and “income otherwise available to the community spouse” (Social Services Law § 366-c [2] [g]), its role is explicitly limited to the posteligibility stage (see, Social Services Law § 366-c [4] [b]; New York State Register, Oct. 17, 1990, at 39). After an institutionalized spouse is eligible to receive Medicaid benefits, then and only then should the income be transferred for the community spouse to satisfy a deficiency in a monthly needs allowance. Of particular significance here, as the Massachusetts Supreme Judicial Court recognized, is that the Federal statute contains “no corresponding limitation on deeming income from the institutionalized spouse to the community spouse” for eligibility purposes (see, Thomas v Commissioner of Div. of Med. Assistance, 425 Mass 738, 747, 682 NE2d 874, 879 *681 [emphasis added]). That court’s analysis, like the Federal nisi prius court in Cleary (supra), operated against the backdrop of the adoption of the “income first” rule by the State of Massachusetts (see, 425 Mass, at 743, n 8, 682 NE2d, at 877-878, n 8). It should be observed that New York’s Social Services Law differs markedly in this key aspect and implicitly establishes a limitation at the preeligibility stage (see, Social Services Law § 366-c [3] [b] [“in determining the availability of income to an institutionalized spouse in determining eligibility * * * (i)ncome solely in the name of the institutionalized spouse or the community spouse shall be considered available only to that spouse”] [emphasis added]).
Thus, in my view, the income determination rules may reasonably be read to create a rebuttable presumption to ostensible title, attribution and ultimate alienability of income sources (see, Social Services Law § 366-c [3]). Until the agency has resolved the eligibility threshold, therefore, no modification or alteration to the attribution or availability of income from an institutionalized spouse for the benefit of the community spouse should be permitted (see, Social Services Law § 366-c [3]).
In this way, before eligibility is established, all resources in excess of the “community spouse resource allowance” (CSRA) would be considered available to the institutionalized spouse (see, Social Services Law § 366-c [5] [a]). After eligibility is established, on the other hand, resource transfers from the institutionalized spouse to the community spouse cannot exceed the preestablished and fixed CSRA (see, Social Services Law § 366-c [6]). The “spousal share” for which the resource allowance is to be established to satisfy the MMMNA before eligibility under Social Services Law § 366-c (8) (c), by contrast, is determined “as of the date of the continuous period of institutionalization of the institutionalized spouse” (Social Services Law § 366-c [2] [c]).
The applicable resource determination rules permit the CSRA to be modified at a fair hearing before eligibility (see, Social Services Law § 366-c [2] [d] [iii]; [8] [c]). Alternatively, the calculation of income can be altered in only two circumstances: (1) preeligibility at a fair hearing to increase the community spouse’s income over the MMMNA upon a showing of “exceptional circumstances,” or (2) after eligibility via a CSMIA deduction from the institutionalized spouse (see, Social Services Law § 366-c [8] [b]; [2] [g]).
*682 D.
In this case, Mrs. Golfs income and resource allowance undeniably failed to add up to the minimum monthly maintenance needs allowance. Rather than transfer Mr. Golfs excess resources as a threshold method to satisfy Mrs. Golfs MMMNA, the agencies elected instead to shift part of Mr. Golfs income for their own calculated benefit — that is, to block eligibility. From the plethora of governing words and paperwork, I can extrapolate no statutory or regulatory authorization for bureaucrats to throw this critical switch at the outset of the process. As to eligibility, they lack the power to enact the policy-driven definition. Concomitantly, on a case-by-case application, they were granted no authority to erect an operative, de facto policy disqualifying a whole category of otherwise eligible persons.
The contradiction of how the social service agencies effectuated their diseligibility conclusion out of a vacuum of statutory empowerment seems evident to me and ought to be viewed as very troublesome. Thus, the Appellate Division correctly nullified the agency action on a sound basis — the reasonably discerned legislative authorization and preferment for “resources first,” as the prescribed sequence and manner of calculating eligibility (see, Matter of Richardson v Commissioner of N. Y. City Dept. of Social Servs., 88 NY2d 35, 39-40; see also, Gardebring v Jenkins, 485 US 415, 430; Gruber v Ohio Dept. of Human Servs., 98 Ohio App 3d 72, 83-84, 647 NE2d 861, 869, supra). Since I believe that the judicial annulment of the agency determination is well founded, it should be accorded a judicial-review deference in this circumstance, and should, therefore, be upheld.
To be sure, an agency’s determination should be sustained when it is rational even though other, equally plausible, interpretations may exist. But that is not so, as here, when the agency’s action strays beyond the reasonably interpreted authorizing language itself and countermands the import and combination of the controlling State statute and implementing regulations (compare, Seittelman v Sabol, 91 NY2d 618, 625-626, supra [decided today]). On its face, therefore, the particular determination constitutes arbitrary and capricious action because it steps over its limited statutory charter and regulations. Nor can it gather sufficient saving justification solely out of the seeds of arguable ambiguity.
*683 rv.
If fiscal, policy and application problems ensue from or inhere in the approach I urge, the other branches of State government are well equipped and invested with the plenary power to alter or shape them to their preferment. They can amend the statute in discrete, definitive terms, as other States have done, to command the “income first” methodology, if that is what they truly wish and expect. I propose that they have not done so thus far because, among other reasons, they evidently have preferred to stand pat with New York’s more embracive and generous eligibility program.
A more restrictive administrative policy alternative should not be judicially countenanced based on arguments addressed to competing marginal applications of speculative fiscal hypotheticals or potential manipulation of process. There are other means and methods to deal with such concerns. Nevertheless, the majority propounds that the “resource first” method would create a “financial boon” (majority opn, at 665), a “vehicle[ ] for enriching the family of an applicant” or “opportunities for sheltering assets” (majority opn, at 671, n 7). Lest there be any doubt whatsoever in this respect, it is important to appreciate that this lawsuit is not about a particular or paradigmatic scam, draining or threatening the public purse in any such ways. Moreover, the Legislature of this State is surely aware of these undesirable leverages and, as previously noted, nonetheless demonstrated an overarching preferential option for the primary statutory purpose of ameliorating spousal impoverishment, for which the Medicare Catastrophic Coverage Act was enacted. Indeed, to help insure this preeminent goal, New York has implemented the maximum permissible allocations under the Federal charter.
In my desire to sum up this case simply, I believe it ultimately reduces to and represents the more fairly common occurrence for many elderly individuals of modest means who reach life’s relatively natural denouéments, only to experience an added frustration engendered by the vicissitudes and vagaries of governmental red tape, running over many years as in this very case. The practicalities of elder care financial planning and expectations, the theoretical structure and fair judicial construction of the web of statutes and regulations, and standard administrative law principles and precedents collectively support, I respectfully submit, the Appellate Division’s appropriately judicial interpretative ruling in favor of the surviving community spouse in this case.
*684 That is essentially why I am unable to agree that the “reasonableness of the agency’s decision to attribute [‘income first’] * * * is evident” or “premised upon a reasonable interpretation of the relevant statutory provisions” (majority opn, at 663, 658). This encompassing conclusion, moreover and for example, falters under assumptions and speculations of a “spouse with no personal income * * * [and] the transfer of several hundred thousand dollars over and above the standard resource allowance” that are used as part of the dispositional analysis of this case (majority opn, at 671). Those circumstances, again, are not this case or this record. This Court, in my opinion, would do better to resolve the issue and case within the framework of the specific facts, record and authorities presented here.
Based on my understanding of the pertinent legislation in its particular words and in its practical, reasonable and proper context, I conclude that the “resource first” method is the route the Legislature sufficiently directed the agencies to take — until they are given a more definitive eligibility definitional formula by legislative policy governance. As a consequence of their not complying with the direction as it presently exists, the agencies’ applied administrative determination denying the application for benefits in this case was properly annulled by the Appellate Division. Its order should be affirmed.
Chief Judge Kaye and Judges Titone, Levine, Ciparick and Wesley concur with Judge Smith; Judge Bellacosa dissents and votes to affirm in a separate opinion.
Judgment appealed from and order of the Appellate Division brought up for review reversed, etc.