AMELIA THOMAS & others[1] *vs.* COMMISSIONER OF THE
DIVISION OF MEDICAL ASSISTANCE.

Suffolk. April 10, 1997. - August 14, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & FRIED, JJ.

*Medicaid. Practice, Civil,* Summary judgment. *Regulation. Administrative
Law,* Regulations, Agency's interpretation of regulation. *Statute,* Construc-
tion.

Discussion of the Medicaid Act, 42 U.S.C. § 1396 et seq., and the cor-
responding State regulations, 130 Code Mass. Regs. § 505, as in effect
from 1993 to 1995, with respect to the calculation of financial eligibility
for benefits for an institutionalized spouse whose partner remains living in
the community. [739-744]

The "income first" rule, 130 Code Mass. Regs. § 505.190(A)(1)(b), as in ef-
fect during 1993 and 1994, which attributed income of an institutionalized
spouse to the "community spouse" for purposes of determining Medicaid
eligibility of the institutionalized spouse, did not violate the statutory
scheme embodied in 42 U.S.C. § 1396r-5 and was consistent with the
policy objectives underlying the Medicare Catastrophic Coverage Act of
1988. [745-749]

CIVIL ACTION commenced in the Superior Court Department on
August 17, 1994.

Motions for summary judgment were heard by *Suzanne
DelVecchio,* J., and *Vieri Volterra,* J., and entry of a final judg-
ment was ordered by *Martha B. Sosman,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

*Rosemary S. Gale,* Assistant Attorney General, for the
defendant.

---

[1]Louis Comis, Caroline Comis, Noah Lewin, and Fay Lewin were the
original plaintiffs. Other persons were joined by motions to amend the
complaint and by motions to intervene. The plaintiffs were certified as a class
on February 22, 1995.

Prior to certification of the class, the original parties filed stipulations of
dismissal. Amelia Thomas and Dorothy Smith became the representative par-
ties.

*John J. Ford* for the plaintiffs.

*Deborah Thomson* for Alzheimer's Association of Eastern Massachusetts, Inc., amicus curiae, submitted a brief.

LYNCH, J. The plaintiffs brought an action against the Commissioner of the Division of Medical Assistance (commissioner) seeking judicial review under G. L. c. 30A, §§ 7 and 14, and declaratory relief under G. L. c. 231A. The plaintiffs alleged that the commissioner's Medicaid eligibility regulation, 130 Code Mass. Regs. § 505.190(A)(1)(b) (the "income first" rule), in effect from June 3, 1994, to July 1, 1995, and the form letter which notified applicants of their right to a fair hearing in effect from October 1, 1989, to March 30, 1995, violated the Federal Medicaid law. The action was bifurcated and the parties filed cross motions for summary judgment on each issue. The plaintiffs' motions were allowed.[2] The commissioner appealed and we granted the plaintiffs' application for direct appellate review. We vacate the summary judgment entered on the "income first" issue and remand to the Superior Court for the entry of summary judgment for the defendant.

1. *Statutory background.* We begin with an overview of the Federal statutory scheme and corresponding State regulations. Medicaid, enacted in 1965 as Title XIX of the Social Security Act, often referred to as the Medicaid Act, 42 U.S.C. §§ 1396 et seq., is a cooperative State-Federal program which provides medical assistance to the poor. The Secretary of the United States Department of Health and Human Services (Secretary) administers the program at the Federal level. A State that chooses to participate in Medicaid must submit a plan to the Secretary which complies with the substantive requirements of §§ 1396 et seq., and the accompanying regulations, 42 C.F.R. § 447.200 (1987). See *Tarin* v. *Commissioner of the Div. of Medical Assistance*, 424 Mass. 743, 746 (1997). The commissioner is responsible for administering the Medicaid program in Massachusetts and is authorized to promulgate regulations in accordance with State and Federal law. See G. L. c. 118E, §§ 1 and 7.

In 1988, Congress enacted the Medicare Catastrophic Coverage Act of 1988 (MCCA). Pub. L. No. 100-360, 102 Stat. 683 (1988). The objective of the MCCA was to protect married

[2]The final judgment, entered on August 8, 1996, ordered the commissioner to notify all adversely affected members of the plaintiff class of their right to request a revised community spouse resources allowance (CSRA).

couples when one spouse (institutionalized spouse) enters a nursing facility by ensuring that the spouse living in the community (community spouse) has sufficient income and resources to live with independence and dignity. Prior to 1988, the Medicaid eligibility rules required couples to deplete virtually all their combined resources before the institutionalized spouse was eligible. Once eligible, most of the couple's income had to be spent on the nursing home care. Frequently, this policy left the community spouse financially vulnerable.[3] The MCCA addressed this problem by setting aside minimum amounts of income and resources for the community spouse.

At the same time, the MCCA was designed to eliminate loopholes which allowed couples to qualify for Medicaid even though they had substantial resources. See *Cleary* v. *Waldman*, 959 F. Supp. 222, 229 (D.N.J. 1997). Under the prior eligibility rules, based on the legal title principle, a couple could shelter a majority of the resources in the community spouse's name, while the institutionalized spouse received Medicaid. See *id.* The MCCA closed this loophole by attributing certain amounts of the couple's combined resources to each spouse for eligibility purposes. Thus, the MCCA struck a balance between preventing impoverishment of the community spouse and ensuring that no one avoided contributing his or her fair amount to medical care.

Section 1396r-5 contains the Medicaid application and eligibility requirements of the MCCA. When a married couple applies for Medicaid, the State agency must calculate the total value of the couple's resources[4] and allocate a share of the resources to each spouse. 42 U.S.C. § 1396r-5(c)(1). For purposes of determining eligibility, the amount allocated to the community spouse is called the community spouse resources allowance (CSRA). 42 U.S.C. § 1396r-5(c)(2)(B). The CSRA is the greatest of (a) $12,000 (adjusted annually), (b) the lesser of one-half total joint resources or $60,000 (adjusted annually), (c) *an amount established pursuant to a fair hearing under subsec-*

---

[3]See Torch, Spousal Impoverishment or Enrichment? An Assessment of Asset and Income Transfers by Medicaid Applicants, 4 Elder L.J. 459, 460-461 (1996).

[4]Subsection 1396r-5(c)(5) of 42 U.S.C. excludes certain assets from the definition of "resources." In particular, "resources" does not include the marital home, household goods, personal belongings, the value of a burial space, and a limited amount of the value of an automobile and funds for burial expenses. See 42 U.S.C. § 1382b(a) and (d).

*tion (e)(2)*, or (d) an amount transferred under court order. 42 U.S.C. § 1396r-5(f)(2).[5] The institutionalized spouse only has available those resources in excess of the CSRA. 42 U.S.C. § 1396r-5(c)(2).

If either spouse is dissatisfied with the CSRA determination, he or she may request a "fair hearing." 42 U.S.C. § 1396r-5(e). At this hearing, the State agency must ascertain the minimum monthly maintenance needs allowance (MMMNA) of the community spouse, which is 150% of the Federal poverty level for a couple, plus certain shelter expenses in excess of thirty per cent of that figure. See 42 U.S.C. § 1396r-5(d)(3), (4). Subsection (e)(2)(C), to which subsection (f)(2)(iii) refers, provides:

> "If either such spouse establishes that the community spouse resources allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the *community spouse's income* to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2), an amount adequate to provide such a minimum monthly maintenance needs allowance" (emphasis added).

If the community spouse's income, including income generated from the CSRA, does not satisfy the MMMNA, the hearing officer must revise the CSRA to provide the community spouse with enough income generating assets to meet the MMMNA level. 42 U.S.C. § 1396r-5(e)(2)(C).

---

[5]The amount of the CSRA is defined in 42 U.S.C. § 1396r-5(f)(2) as:
"(A) the greatest of —

"(i) $12,000 (subject to adjustment under subsection (g)), or, if greater (but not to exceed the amount specified in clause (ii)(II)) an amount specified under the State plan,

"(ii) the lesser of (I) the spousal share computed under subsection (c)(1), or (II) $60,000 (subject to adjustment under subsection (g)).

"(iii) the amount established under subsection (e)(2); or

"(iv) the amount transferred under a court order under paragraph (3); exceeds

"(B) the amount of the resources otherwise available to the community spouse (determined without regard to such an allowance)."

The resources available to the institutionalized spouse must not exceed a prescribed limit, which in this case was $2,000. If the applicant's resources exceed the prescribed limit, the applicant must "spend down" those assets to become eligible. See *Tarin* v. *Commissioner of the Div. of Medical Assistance, supra* at 747-748.

Section 1396r-5 also provides for the allocation and use of each spouse's income. Subsection (b) sets the rules for the treatment of income.[6] Subsection (b)(1) provides that no income of the community spouse shall be deemed available to the institutionalized spouse. Subsection (b)(2) governs the determination of the income of the institutionalized spouse or community spouse for purposes of the posteligibility income determination described in subsection (d). With respect to nontrust property, payment of income solely in the name of one spouse is considered available only to that spouse. Payment in both spouses' names is divided equally. 42 U.S.C. § 1396r-5(b)(2). In general, for posteligibility purposes, each spouse is entitled to his or her own income.

Subsection (d) provides for certain allowances which may be deducted from the institutionalized spouse's income that is applied to payment of medical costs. Subsection (d)(1) provides, in part, as follows:

> "*After an institutionalized spouse is determined . . . to be eligible* for medical assistance, in determining the amount of the spouse's income that is to be applied monthly to payment for the costs of care in the institution, there shall be deducted . . .

---

[6]Section 1396r-5(b), entitled "Rules for treatment of income," provides, in part, as follows:

"(1) Separate treatment of income. During any month in which an institutionalized spouse is in the institution, except as provided in paragraph (2), no income of the community spouse shall be deemed available to the institutionalized spouse.

"(2) Attribution of income. In determining the income of an institutionalized spouse or community spouse for purposes of the post-eligibility income determination described in subsection (d), except as otherwise provided in this section and regardless of any State laws relating to community property or the division of marital property, the following rules apply . . . ."

"(B) A community spouse monthly income allowance (as defined in paragraph (2)), but only to the extent income of the institutionalized spouse is made available to (or for the benefit of) the community spouse." (Emphasis added.)

The community spouse monthly income allowance (CSMIA) is defined as the amount by which the MMMNA exceeds the monthly income otherwise available to the community spouse.[7] Thus, the CSMIA is intended to make up any difference between the MMMNA and the community spouse's income. 42 U.S.C. § 1396r-5(d)(1). On appeal, we must decide whether § 1396r-5 permits the CSMIA to be deemed part of the "community spouse's income" as the term is used in subsection (e)(2)(C), for purposes of determining whether the CSRA needs to be readjusted at the time eligibility is determined.

In 1994, the commissioner adopted the so-called "income first" rule.[8] During the period at issue on appeal, 130 Code Mass. Regs. § 505.190(A)(1)(b) provided:

---

[7]Section 1396r-5(d)(2) of 42 U.S.C. defines "the community spouse monthly income allowance" as follows:

> "In this section (except as provided in paragraph (5)), the 'community spouse monthly income allowance' for a community spouse is an amount by which —
>
>> "(A) except as provided in subsection (e), the minimum monthly maintenance needs allowance (established under and in accordance with subparagraph (3)) for the spouse, exceeds
>>
>> "(B) the amount of monthly income otherwise available to the community spouse (determined without regard to such an allowance). . . ."

[8]The income first rule is no longer in effect in Massachusetts. Pursuant to St. 1995, c. 38, § 130, the following provision was added to G. L. c. 118E, § 21A:

> "(c) In making determinations under this section, the [commissioner] shall revise the community spouse resource allowance to permit the community spouse to retain a larger share of the combined spousal resources if the income of the community spouse, *without reference to the income of the institutionalized spouse*, falls below the minimum monthly maintenance needs allowance of the community spouse. . ." (emphasis added).

This amendment precluded use of the income first method with regard to the fair hearing described under subsection (e)(2)(C).

"If the gross income as defined in 130 CMR 505.190(A)(1)(a) is less than the minimum monthly maintenance needs allowance (MMMNA) determined in accordance with 130 CMR 506.220(B), then the fair hearing officer shall deem from the institutionalized spouse to the community spouse the amount of income remaining after the personal needs allowance deduction described in 130 CMR 506.420 that, when added to the community spouse's gross available income, would raise the community spouse's total income to an amount up to, but not in excess of, the MMMNA."

The institutionalized spouse's income was deemed available to the community spouse to the extent necessary to meet the MMMNA. Thus, the CSRA was only redetermined when the CSMIA was not adequate to satisfy the MMMNA. 130 Code Mass. Regs. § 505.190(A)(1)(c). As a result, it was less likely that the CSRA would be increased, which in turn left the institutionalized spouse with more available resources, and therefore made it harder to qualify for Medicaid. *Id.*

2. *Facts.* These facts were not in dispute for purposes of summary judgment.

a. *Dorothy Smith.* In June, 1994, Dorothy Smith's husband, George Smith, was admitted to a nursing home. At the time, her husband had a monthly income of $1,079 ($892 social security and $187 pension), and she had $325 in social security income. The couple's countable resources were $54,300. For purposes of determining her husband's Medicaid eligibility, Dorothy Smith's CSRA was $27,150, thus leaving her husband with $27,150 in available resources.

On September 27, 1994, the commissioner denied her husband's application for Medicaid because his resources exceeded the eligibility limits. The couple would have to spend down $25,150 to become eligible.

On October 13, 1994, Dorothy Smith requested a "fair hearing." She argued that the CSRA should be increased because her monthly income fell below the MMMNA. The hearing officer determined that Dorothy Smith's MMMNA was $1,375. Her monthly gross income of $386 ($325 in social security plus $61 in interest earned from the CSRA) did not meet her MMMNA. Applying the income first rule, 130 Code Mass. Regs. § 505.190(A)(1)(b), the hearing officer deemed $989 of

her husband's income to Dorothy Smith. Because this allocation was sufficient to raise her income to the MMMNA level, the hearing officer concluded that there was no need to adjust the CSRA. As a result, the resources available to Dorothy Smith's husband still exceeded the eligibility limit.

b. *Amelia Thomas.* In November, 1993, Amelia Thomas's husband, Edward F. Thomas, was admitted to a nursing home. When her husband applied for Medicaid benefits, his share of the couple's resources was $40,313, or one-half of the total resources of $80,626. The commissioner informed him that he was not eligible for Medicaid.

The denial notice received by Amelia Thomas explained that, in order to become eligible for Medicaid, the following steps were required:

> "First, you must lower your assets to $42,313 [CSRA plus $2,000] and show that you have done this within 30 days. You can spend the excess assets on your needs but you cannot give them away. . . . After you have lowered your assets and become eligible for Medicaid, you may have to give your facility part of your income every month to help pay for your care. . . . If you want to find out more about how to become eligible for Medicaid ask for a copy of the excess income and assets flier."

On the back of the denial notice was the following description of the right to appeal: "If you disagree with any action taken by the Department of Public Welfare, you have the right to appeal and request a fair hearing before an independent referee." Rather than appeal from the denial of the benefits, the Thomases waited six and one-half months and reapplied for Medicaid.

3. *Discussion.* Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). See *Dullea* v. *Safety Ins. Co.,* 424 Mass. 37, 38-39 (1997); *Massachusetts Hosp. Ass'n, Inc.* v. *Department of Pub. Welfare,* 419 Mass. 644, 649 (1995).

a. *Income first rule.* The first issue we must consider is whether the State's income first rule, 130 Code Mass. Regs. § 505.190(A)(1)(b), which attributed income to the community spouse before resources were redetermined for purposes of subsection (e)(2)(C), violated the statutory scheme embodied in

42 U.S.C. § 1396r-5. The judge below held that the income first rule was prohibited under § 1396r-5. Based on our review of the statute, however, we conclude that § 1396r-5 does not prohibit the attribution of income for eligibility purposes. Therefore, the commissioner was within his authority to adopt the income first approach.

The commissioner has the authority to promulgate regulations which give effect to legislative mandates. See *Tarin* v. *Commissioner of the Div. of Medical Assistance*, 424 Mass. 743, 746 (1997); *Youville Hosp.* v. *Commonwealth*, 416 Mass. 142, 146 (1993). We accord these regulations the same deference we extend to statutes. See *American Family Life Assur. Co.* v. *Commissioner of Ins.*, 388 Mass. 468, 477, cert. denied, 464 U.S. 850 (1983). "Thus, we must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Id.*, quoting *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977). "We are limited to a determination whether the State action is arbitrary, capricious, or contrary to law." *Tarin* v. *Commissioner of the Div. of Medical Assistance*, supra at 750, quoting *Massachusetts Hosp. Ass'n, Inc.* v. *Department of Pub. Welfare*, supra at 652.

The plaintiffs contend that the attribution of income from the institutionalized spouse to the community spouse can only take place after eligibility has been determined.[9] Because the CSRA calculation is a prerequisite to determining eligibility, the plaintiffs argue that a regulation which attributed income to the community spouse under subsection (e)(2)(C) violated § 1396r-5. We disagree.

It does not appear to us that subsections (b) and (d) necessarily prescribe a sequential restriction on income attribution. While it is true that subsections (b)(2) and (d) apply "after" eligibility has been determined, this does not mean that income

---

[9]The plaintiffs also claim that the income first rule was prohibited under G. L. c. 118E, § 21A. This argument, which first appears on the last page of the plaintiff's brief, does not rise to the level of appellate argument. See *Greater Media, Inc.* v. *Department of Pub. Utils.*, 415 Mass. 409, 418 (1993) (four-sentence discussion does not rise to level of proper appellate argument). Therefore, we decline to consider it. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

can be deemed to the community spouse "only" after eligibility has been determined. "The words of [a] statute cannot be stretched beyond [their] fair meaning . . . ." *Holbrook* v. *Randolph*, 374 Mass. 437, 440-441 (1978). Rather, subsections (b)(2) and (d) can be interpreted as a framework for protecting income for the community spouse by limiting the amount of the institutionalized spouse's income which must be used to pay medical costs after the latter is determined eligible.

Furthermore, there does not appear to be any restriction on deeming income to the community spouse for eligibility purposes. Subsection (b)(1) provides that, "no income of the community spouse shall be deemed available to the institutionalized spouse." There is no corresponding limitation on deeming income from the institutionalized spouse to the community spouse. Absent such a restriction, the commissioner was not prohibited from deeming income to the community spouse under subsection (e)(2)(C). See *Cleary* v. *Waldman*, 959 F. Supp. 222, 232 (D.N.J. 1997).

In *Cleary* v. *Waldman*, *supra*, the judge was asked to decide whether New Jersey's income first rule violated § 1396r-5. The judge concluded that the posteligibility income allocation provisions of subsection (b) and (d) did not apply to resources allocation provisions of subsection (e)(2)(C). With regard to subsection (e)(2)(C), the judge observed:

> "That provision deals with resource, not income, allocation. In light of the detailed provisions of subsection (d) designed to make available to the community spouse as much, but only as much, of the institutionalized spouse's income as necessary to ensure her monthly need, it would be anomalous to construe subsection (e)(2)(C) in such a manner as to exclude the institutionalized spouse's income from the calculation and substitute for it resources which would provide the needed income to ensure that the community spouse received her monthly needs allowance."

*Id.* The judge reasoned that the community spouse's income described in subsection (e)(2)(C) may include income deemed from the institutionalized spouse. *Id.* Therefore, he held that New Jersey's income first income method was permissible under § 1396r-5.

This conclusion is consistent with the position taken by the Secretary with regard to the income first rule. State Medicaid Agency Regional Bulletin No. 93-42, issued by the Health Care Financing Administration in July, 1993, stated:

> "We wish to make it clear that the community spouse's income for this purpose includes whatever portion of the minimum monthly maintenance needs allowance the institutionalized spouse has already made available to him or her. . . . Since the institutionalized spouse must transfer the income allowance to the community spouse for post-eligibility purposes, this income should already belong to the community spouse at the time of a [subsection] (e)(2)(C) hearing."

In September, 1994, the Health Care Financing Administration issued State Medicaid Agency Regional Bulletin No. 94-24, to clarify its position on the income first rule. The bulletin stated: "States have the option to use the 'income first' rule or to apply some other reasonable interpretation of the law until final regulations specifically addressing this issue are published in the Federal Register." Although this view has not been formalized into a regulation, it appears that Federal officials administering the Medicaid program concluded that Congress gave States the authority to decide whether to consider the institutionalized spouse's income or solely his resources in considering adjustments to the CSRA under subsection (e)(2)(C). See *Cleary* v. *Waldman, supra* at 233. The Secretary's interpretation is entitled to deference because "[i]n a situation of this kind, Congress entrusts to the Secretary rather than to the courts, the primary responsibility for interpreting the statutory term." *Tarin* v. *Commissioner of the Div. of Medical Assistance, supra* at 751, quoting *Batterton* v. *Francis*, 432 U.S. 416, 425 (1977). See *Schweiker* v. *Gray Panthers*, 453 U.S. 34, 43 (1981) ("[p]erhaps appreciating the complexity of what it had wrought, Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the [Social Security] Act").

Finally, the income first rule did not necessarily frustrate the policy objectives underlying the MCCA. First, the community spouse still retained one-half of the marital resources, in addition to the marital home, household goods, and other valuable

assets. See 42 U.S.C. § 1396r-5(c)(5). Second, the income first rule ensured that the community spouse received a minimum amount of income on which to live. While it is true that the income deemed to the community spouse from the institutionalized spouse was not guaranteed on the death of the latter, it seems unlikely that Congress would require States to create an endowment which would forever provide the community spouse with income and totally immunize a substantial portion of the institutionalized spouse's resources from having to pay for nursing home care.[10] In the present case, even if the entire amount available to Dorothy Smith's husband, $27,150, were transferred to her, she would have only received an additional $61 in interest income each month. Exempting a substantial portion of the institutionalized spouse's resources would subvert the other purpose of the MCCA, which was to require couples to bear a reasonable amount of the cost of institutionalized care and thus preserve Medicaid resources.

Because there was no express prohibition on deeming income to the community spouse before eligibility is determined, we must defer to the commissioner's interpretation of § 1396r-5.

b. *Notice requirement.* The plaintiffs also argue that the letter used from October 1, 1989, to March 30, 1995, to inform applicants of their right to appeal violated the notice requirements of § 1396r-5.[11] In light of our decision in this case and the fact that the form letter was revised by legislative mandate, we do not reach this issue.

The judgment of the Superior Court entered August 8, 1996,

---

[10]The plaintiffs note that, in some circumstances, a community spouse's income may drop when the institutionalized spouse dies. For example, aggregate social security payments may be less after the primary wage earner dies. This is a circumstance which could be considered at a subsection (e)(2)(C) hearing.

[11]The Legislature inserted G. L. c. 118E, § 21A, by St. 1994, c. 60, § 117, to require that the commissioner's notice form include the following:

> "the right to a fair hearing concerning ownership or availability of income or resources and the determination of the community spouse monthly income allowance or community spouse resource allowance at the time Medicaid eligibility is determined."

G.L. c. 118E, § 21A (*b* (2) (ii).

In December, 1992, the Department of Health and Human Services had demanded that the commissioner's form letter explain that either spouse may request a revised CSRA at the hearing.

is vacated and the case is remanded to the Superior Court for the entry of summary judgment for the defendant.

*So ordered.*