Robert CHAMBERS, et al.,
Plaintiffs–Appellees,

v.

OHIO DEPARTMENT OF HUMAN
SERVICES, et al., Defendants–
Appellants.

No. 96–3046.

United States Court of Appeals,
Sixth Circuit.

Argued May 2, 1997.

Decided May 27, 1998.

Jeffrey S. Sutton (argued and briefed), State Solicitor, Columbus, OH, Karen L. Lazorishak (briefed), James M. McGovern (briefed), Office of the Attorney General of Ohio, Columbus, OH, for Appellants.

Dennis L. Pergram (argued and briefed), Martin, Pergram & Browning, Worthington, OH, Clay P. Graham (briefed), Graham, McClelland, McCann & Ransbottom, Zanesville, OH, for Appellees.

Douglas A. Baker (briefed), Baker, Baker & Sweterlitsch, Columbus, OH, Geoffrey E. Webster (briefed), Columbus, OH, Charles A. Miller (argued), Covington & Burling, Washington, DC, Carol Rolf (argued), Roth, Rolf & Goffman, Cleveland, OH, for Amici Curiae.

Before: WELLFORD, MOORE, and COLE, Circuit Judges.

## OPINION

R. GUY COLE, JR., Circuit Judge.

Defendant–Appellant Arnold Tompkins, Director of the Ohio Department of Human Services (ODHS), appeals the district court's grant of partial summary judgment and injunctive relief in favor of class-action plaintiffs-appellees, in which the district court ordered ODHS to change its Medicaid eligibility policy and provide notice to class members regarding eligibility for Medicaid benefits. For the reasons that follow, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

### I.

Robert Chambers and his wife Jean Chambers, along with Lauren Holland and his wife Sarah Holland (collectively, "appellees"), filed this class action in the Court of Common Pleas, Franklin County, Ohio, on behalf of themselves and others similarly situated, against ODHS and its director, Arnold Tompkins, in his official capacity. ODHS is the state administrative agency responsible for implementing the federal statute at issue in this case, the Medicare Catastrophic Coverage Act of 1988, 42 U.S.C. § 1396r–5 (MCCA). The class-action complaint alleged that ODHS misinterpreted and misapplied certain provisions of the MCCA in determining eligibility for Medicaid benefits. More specifically, appellees contended that ODHS improperly determined Medicaid eligibility by applying an "income-first" rule as opposed to a "resource-first" rule for the transfer of assets between spouses when one spouse is institutionalized in a nursing home.

Whether ODHS utilizes the income-first rule or the resource-first rule is critical in the determination of Medicaid eligibility. Under an income-first approach, a nursing home resident must transfer income before he or she may transfer resources—or assets—to the noninstitutionalized or "community" spouse, if it is determined under the formula provided by the MCCA that the community spouse is entitled to additional monies for support. Because the institutionalized spouse first transfers his or her income to the community spouse under the income-first rule, it is less likely that the institutionalized spouse will be able to transfer resources to the community spouse, leaving the institutionalized spouse with a greater amount of resources in his or her own name. An insti-

tutionalized spouse possessing resources in excess of $1500 is ineligible for Medicaid benefits. Thus, the income-first rule renders an institutionalized spouse less likely to qualify for Medicaid assistance and obligated to pay nursing home and other medical expenses with his or her own assets. In applying the MCCA, ODHS opted to use the income-first rule in Ohio from approximately 1990 until January 1996.

In addition to arguing that ODHS improperly interpreted the MCCA by applying the income-first rule, appellees further claimed that ODHS failed to meet Medicaid obligations to notify applicants and their spouses of the procedures and requirements for obtaining Medicaid benefits.

ODHS removed the case to the district court and, in addition, sought dismissal or summary judgment; appellees filed a motion for partial summary judgment. On March 31, 1995, the district court certified plaintiffs as a class,[1] and on July 13, 1995, ruled on the various motions before it ("July Order"). In its July Order, the district court dismissed ODHS on the basis of Eleventh Amendment immunity, but permitted Tompkins to remain as a defendant.[2] In addition, the district court granted appellees' motion for partial summary judgment, concluding that the "plain meaning" of the relevant provisions of the MCCA mandated a resource-first approach in determining a nursing home resident's eligibility for Medicaid benefits; thus, ODHS misapplied the statute by using the income-first rule. Finally, the district court determined that the Medicaid application forms used by ODHS did not properly notify applicants of the methods used by ODHS to compute eligibility for benefits. The district court therefore required ODHS to submit to the court a proposed notice to Medicaid applicants that informs them of their rights under the MCCA.

Thereafter, ODHS submitted to the court proposed revisions of its rules regarding methods to compute eligibility, as well as proposed revised Medicaid application forms, in order to conform with the district court's ruling. ODHS further issued proposed new administrative rules indicating that a resource-first approach, as ordered by the district court, would be used in Ohio effective January 1, 1996. Appellees contested ODHS's proposed revisions, however, arguing that the revisions were inadequate under federal law and failed to comply fully with the court's order. In October 1995, appellees filed several motions for further relief, seeking an order compelling ODHS to include language in its application forms for Medicaid benefits that specifically set forth the resource-first rule and an order compelling ODHS to identify and notify the class of the court's July Order. On December 14, 1995, the district court granted appellees' motions and issued an injunction ("December Injunction") requiring ODHS to identify and notify the following classes of individuals of their potential eligibility for Medicaid benefits and to inform them that state law may provide a remedy for any past erroneous denials of eligibility or benefits:

(1) Nursing home residents and their spouses who have applied for Medicaid benefits but are not presently receiving benefits because their application was denied due to excess resources;

(2) Nursing home residents and their spouses who have received a resource assessment but who have not applied for Medicaid benefits;

(3) Nursing home residents and their spouses who are presently receiving Medicaid benefits but were denied benefits previously due to excess resources;

(4) Nursing home residents and their spouses who are presently receiving Medicaid benefits but did not apply for Medicaid until after the nursing home resident spent his/her resources down to $1,500; and

(5) Nursing home residents and their spouses who have not applied for Medicaid

---

1. The parties stipulated that the class consists of "[a]ll individuals in the State of Ohio who from January 1990 are, were, or in the future would be" eligible for Medicaid coverage and who were in marriages in which one spouse was institutionalized while the other continued to live in the community.

2. For convenience, we will continue to refer to appellant as "ODHS."

benefits or requested a resource assessment.

ODHS contends that the notice required by the injunction will incur costs in excess of two million dollars, while processing the resulting claims will incur costs ranging from three hundred million to one billion dollars.

On January 5, 1996, ODHS filed in the district court an emergency motion for a partial stay of the court's December Injunction and also filed a notice of appeal to this court with respect to the July Order and the December Injunction.[3] The district court denied ODHS's request for a stay; however, upon ODHS's motion to this court, we granted a stay of the district court's December Injunction pending this appeal.

## II.

■ At the outset, we must consider the scope of our jurisdiction in this matter. Appellees argue that we do not have jurisdiction to consider the district court's July Order because ODHS failed to file a timely notice of interlocutory appeal. Appellees thus claim that ODHS waived interlocutory appeal of the issue decided by the July Order: whether the MCCA mandates a resource-first approach. Appellees argue that our consideration is jurisdictionally limited to the order from which ODHS filed a notice of appeal, that is, the December Injunction which ordered ODHS to provide notice of the July Order to the class. Appellees thus contend that we are without jurisdiction to consider the district court's determination that the MCCA mandates a resource-first approach. We disagree.

3. Appellants' notice of appeal also included the district court's March 31, 1995 order in which the district court certified the class; however, appellants present no argument regarding class certification. Moreover, appellants stipulated to the certification of the class. Accordingly, we do not address the district court's March 31,1995 order.

4. 28 U.S.C. § 1292(a)(1) provides in part that "the courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts of the United States ... granting ... injunctions."

Appellees do not dispute our jurisdiction to consider ODHS's timely appeal from the district court's December 14, 1995 interlocutory order; because the district court issued an injunction at that time, the order was immediately appealable pursuant to 28 U.S.C. § 1292(a)(1).[4] Appellees contend that the July 13, 1995 interlocutory order, although not technically termed an injunction, had the effect of an injunction because it required ODHS to revise its rules and application forms. Appellees thus claim that · because the July Order was an injunction, that order was immediately appealable and ODHS waived its right to appeal by failing to file a timely notice of appeal. Even if we assume that the July Order was an injunction, we must consider whether ODHS waived interlocutory appeal of that order.

■ It is clear that parties are not required to file an interlocutory appeal; rather, a party may forgo an interlocutory appeal and present the issue to this court after final judgment. See Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 608 (7th Cir.1993); 11A Wright & Miller, Federal Practice and Procedure § 2962 (1973 & Supp.1997) (stating that § 1292(a)(1) "merely permits interlocutory appeal; a party does not waive any rights [of appeal of interlocutory orders at the time of final judgment] by failing to seek immediate review"); see also F.W. Kerr Chem. Co. v. Crandall Assoc., Inc., 815 F.2d 426, 428–29 (6th Cir.1987) (failure to appeal from a preliminary injunction order does not constitute a waiver of those issues in appeal from final judgment; however, "such a failure to appeal would logically preclude a subsequent interlocutory appeal under § 1292(a)(1) from an unwarranted successive motion").[5] Thus, ODHS

5. In Kerr, we held that we did not have jurisdiction to consider an appeal from a district court's order denying plaintiff's third motion for preliminary injunction that was based on facts that were unchanged from the time of the second motion. Despite Kerr's disallowance of a late appeal from an interlocutory order, we do not believe that Kerr mandates a blanket restriction of this court's review of interlocutory appeals that could have been filed at an earlier instance. Instead, Kerr restricts an interlocutory appeal when a party successively asks for the same relief based on the same facts, then files an appeal that should have been filed at the time of the first decision. That situation is distinguishable from the present case.

did not "waive" review upon final judgment of the July Order by failing to file an appeal at that time. Nevertheless, because this case has not yet come to final judgment, we must determine whether there now exists a jurisdictional basis for interlocutory appeal.

■ The doctrine of pendent appellate jurisdiction allows an appellate court, in its discretion, to exercise jurisdiction over issues that are not independently appealable when those issues are "inextricably intertwined" with matters over which the appellate court properly and independently has jurisdiction. *See Swint v. Chambers County Comm'n*, 514 U.S. 35, 49–50, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995); *Law v. National Collegiate Athletic Ass'n*, 134 F.3d 1025, 1028 (10th Cir.1998); *Brennan v. Township of Northville*, 78 F.3d 1152, 1157–58 (6th Cir.1996). In *Brennan*, we exercised pendent appellate jurisdiction with respect to the issue of liability in our determination regarding qualified immunity. *Id.; but see Williams v. Kentucky*, 24 F.3d 1526, 1542 (6th Cir.1994) (declining to exercise pendent appellate jurisdiction to consider underlying merits of constitutional claim when reviewing issue of qualified immunity). A pendent appellate claim can be regarded as "inextricably intertwined" with a properly reviewable claim only if the pendent claim "is coterminous with, or subsumed in, the claim before the court on interlocutory appeal." *Law*, 134 F.3d at 1028 (citation omitted). The "inextricably intertwined" requirement of pendent appellate jurisdiction is not meant to be loosely applied as a matter of discretion; rather, such jurisdiction only may be exercised when the appealable issue at hand cannot be resolved without addressing the nonappealable collateral issue. *See Archie v. Lanier*, 95 F.3d 438, 443 (6th Cir.1996).

In the present case, the district court determined that the MCCA mandates a resource-first approach in its July Order. In its December Injunction, the district court ordered ODHS to provide notice to the class of its July Order. Despite the fact that notice to the class is a distinct issue from the issue of whether the MCCA man-

dates a resource-first approach, we believe that the issues determined in the July Order are "inextricably intertwined" with the notice requirements set forth in the December Injunction. Put differently, we cannot determine the appropriateness of ODHS's notice if we have not yet had an opportunity to review the issues that dictate the content of that notice. Our consideration of the notice ordered by the district court depends upon the underlying merits of the issues giving rise to the notice requirement. As the district court stated in its December Injunction, "[T]his Court can order the notices be sent out as 'necessary or proper relief based on a declaratory judgment,' which is the Court's July 13, 1995 Order in favor of plaintiffs." It simply does not make sense to review the propriety of the required notice at this time, and wait until final judgment to review the underlying merits of this case. If we have not yet had the opportunity to determine whether the MCCA mandates a resource-first approach, we cannot give meaningful review to the issue of the notice that is required.

With the foregoing in mind, we believe that this case is especially appropriate for the exercise of pendent appellate jurisdiction. The interpretation of the relevant provisions of the MCCA is "inextricably intertwined" with the notice that must be provided to individuals affected by the statute. Accordingly, we exercise our discretion to review the July Order under the doctrine of pendent appellate jurisdiction in connection with our review of the district court's December Injunction.[6]

### III.

■ Turning to the pivotal issue of this case—whether the MCCA mandates a resource-first approach in determining a nursing home resident's eligibility for Medicaid benefits—we begin with an overview of the Medicaid statutory scheme. Medicaid, enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., is a cooperative federal-state program that was established to

6. Regardless of whether the July Order was itself an injunction or simply a grant of partial summary judgment, the doctrine of pendent appellate jurisdiction brings those issues, which are inextricably intertwined with the issues determined by the December Injunction, before us.

enable the states to provide medical services to those who cannot afford such services. For states that participate in the program, such as Ohio, the federal government provides partial funding and establishes mandatory and optional categories of eligibility and services covered. The Secretary of the United States Department of Health and Human Services, through the Health Care Financing Administration, administers the program at the federal level, while ODHS administers the program at the state level with the assistance of Ohio's county departments of human services. The Medicaid laws set various limits on an individual's income and resources (the term used for assets) for purposes of eligibility.

In 1988, Congress enacted the Medicare Catastrophic Coverage Act, 42 U.S.C. § 1396r–5 (MCCA). The objective of the MCCA was to protect married couples when one spouse is institutionalized in a nursing home, so that the spouse who continues to reside in the community is not impoverished and has sufficient income and resources to live independently. *See* H.R.Rep. No. 100–105(II), 100th Cong., 2d Sess. at 65 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 888. Prior to 1988, Medicaid eligibility rules required couples to deplete their combined resources before the institutionalized spouse was eligible for benefits, often leaving the community spouse financially vulnerable. The MCCA attempted to strike a balance between preventing impoverishment of the community spouse by excluding minimum amounts of resources and income for that spouse from eligibility considerations, and preventing a financially solvent institutionalized spouse from receiving Medicaid benefits by ensuring that income was not completely transferred to the community spouse.

The MCCA governs the calculation and transfer of both income and resources of the community spouse and the institutionalized spouse for purposes of Medicaid eligibility. The issue in this case involves the approach

used to supplement the amount of resources attributed to the community spouse, when his or her income is inadequate under the MCCA. The statutory provision for revising the community spouse resource allowance is set out in 42 U.S.C. § 1396r–5(e)(2)(C). Before that subsection is addressed, however, it is necessary to discuss the subsections of the statute that deal with income and resources.

Subsections (b) and (d) of § 1396r–5 provide the rules for the treatment of income. Essentially, subsection (b) incorporates the "name on the check" principle, whereby income is considered available only to the spouse in whose name payment is made. *See* 42 U.S.C. § 1396r–5(b). Income paid in the name of both spouses is equally divided between them. *See* 42 U.S.C. § 1396r–5(b)(2). Under these rules, the community spouse's income is not considered in determining the eligibility of the institutionalized spouse. *See* 42 U.S.C. § 1396r–5(b)(1).

Once eligibility is established, subsection (d) provides for certain allowances that may be deducted from the institutionalized spouse's income that must be applied to the payment of medical costs. Subsection (d)(3) provides for the computation of the community spouse's *monthly minimum maintenance needs allowance* (MMMNA). This is an amount that ensures that the community spouse has income significantly above the poverty level.[7] Subsection (d)(2) defines the community spouse's monthly income allowance as the amount by which the MMMNA exceeds the monthly income otherwise available to the community spouse. The community spouse's monthly income allowance is an amount that is allowed to be deducted from the institutionalized spouse's income. *See* 42 U.S.C. § 1396r–5(d)(1).

In addition to income, the total value of the couple's resources must be calculated and a share allocated to each spouse.[8] *See* 42 U.S.C. § 1396r–5(c)(1). For purposes of eligibility, the amount allocated to the community spouse is called the community spouse

---

7. The MMMNA is 150% of the federal poverty level for a couple, plus certain shelter expenses in excess of 30% of that figure. 42 U.S.C. § 1396r–5(d)(3), (4).

8. "Resources" do not include the marital home, household goods, personal belongings, the value of a burial space, and a limited amount for the value of an automobile and funds for burial expenses. 42 U.S.C. § 1396r–5(c)(5).

resource allowance.[9] *See* 42 U.S.C. § 1396r–5(c)(2)(B). The resources available to the institutionalized spouse must not exceed a prescribed limit; otherwise, the institutionalized spouse must "spend down"—or deplete those assets to the statutory maximum—in order to become eligible for benefits.

If either spouse is dissatisfied with the determination of the community spouse resource allowance, that spouse may request a hearing. *See* 42 U.S.C. § 1396r–5(e). At the hearing, the state must ascertain the MMMNA of the community spouse. If the community spouse's MMMNA is not met, the hearing officer must revise the community spouse resource allocation to provide the community spouse with enough income-generating assets to meet the MMMNA. *See* 42 U.S.C. § 1396r–5 (e)(2)(C). This subsection is the critical provision that is the crux of the dispute in this appeal. Subsection (e)(2)(C) provides as follows:

> Revision of community spouse resource allowance. If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's **income** to the monthly minimum maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2), an amount adequate to provide such a minimum monthly maintenance needs allowance.

42 U.S.C. § 1396r–5(e)(2)(c) (emphasis added).[10] This provision does not specify what is included in the term "income."

In summary, when an institutionalized spouse applies for Medicaid benefits, a county agency performs a resource assessment and calculation of the community spouse re-source allowance, which represents the amount of resources allocated to the community spouse. At this point in time, the local agency determines whether the institutionalized spouse has countable resources attributed to him or her in excess of $1,500; if so, the agency notifies the couple of its calculation and determination that the institutionalized spouse is ineligible for Medicaid until the institutionalized spouse's resources are "spent down" to $1500. If either spouse disputes these calculations, that spouse can request a revision of the community spouse resource allowance at a hearing pursuant to 42 U.S.C. § 1396r–5(e)(2)(C). Ohio's implementation of this section—in particular, what is included in the term "income"—is the subject of dispute in the present case.

## IV.

In applying 42 U.S.C. § 1396r–5(e)(2)(C), the issue presented by this appeal is whether a community spouse's "income" includes—or does not include—any transfer of income from the institutionalized spouse. Whether this transferred income is included distinguishes the two possible approaches used to implement subsection (e)(2)(C). These two approaches, as mentioned before, are known as the income-first approach and the resource-first approach.

Under an income-first approach, an institutionalized spouse's income is transferred to the community spouse prior to the transfer of resources, if necessary to raise the community spouse's income to the MMMNA. Thus, the transfer of income takes place prior to any revision of the community spouse resource allowance. Stated otherwise, the income-first approach includes any income transferred from the institutionalized spouse

---

**9.** The amount of the community spouse resource allowance is the greatest of
 (a) $ 12,000 (adjusted annually),
 (b) the lesser of one-half total joint resources or $60,000 (adjusted annually),
 (c) an amount established pursuant to a fair hearing under subsection (e)(2); or
 (d) an amount transferred under court order.
*See* 42 U.S.C. § 1396r–5(f)(2)(A).

**10.** Ohio's implementation of subsection (e)(2)(C) provided as follows:

> If either the [institutionalized spouse] or the [community spouse] can document that the [community spouse] resource allowance (in relation to the amount of income generated by it) is inadequate to raise the [community spouse's] income to the MMMNA, a hearing decision may substitute a higher resource allowance to provide additional income as necessary.

Ohio Admin. Code § 5101: 6–7–02(A)(4).

to the community spouse in determining the community spouse's income under subsection (e)(2)(C). The resource-first approach, on the other hand, requires a transfer of resources from the institutionalized spouse to meet the MMMNA, without regard to the institutionalized spouse's income. The resource-first approach therefore does not include transferred income from the institutionalized spouse as part of the community spouse's income under subsection (e)(2)(C).

The United States Department of Health and Human Services (HHS) has not, to date, issued federal regulations concerning the implementation of § 1396r–5(e)(2)(C), or determined whether the income-first or resource-first approach should be used. However, in December 1993, HHS issued a regional opinion letter indicating that states were compelled to adopt an income-first approach. *See* Health Care Financing Administration (HCFA), Medicaid Operations Branch, Chicago Regional State Letter No. 51–93 (December 1993). However, in July 1994, HHS issued a second opinion letter, clarifying that the statute did not mandate an income-first approach and that states have the option to use that approach or "to apply some other reasonable interpretation of the law until we have issued final regulations which specifically address this issue." HCFA, Medicaid Operations Branch, Chicago Regional State Letter No. 22–94 at 2 (July 1994).

11. Beginning in 1996, ODHS adopted the resource-first approach instead of the income-first approach. Thus, the issues presented in this case are limited to the time period prior to January 1996, when ODHS applied the income-first rule.

12. Appellants set forth an illustration that is helpful in distinguishing an income-first approach from a resource-first approach. One of the named claimants, Mr. Lauren Holland, entered a nursing home and applied for Medicaid. At the time of application, Mr. and Mrs. Holland had joint, non-exempt resources in the amount of $169,655. For purposes of determining eligibility, ODHS allocated $72,660 of this total to Mrs. Holland as her community spouse resource allowance; thus, Mr. Holland retained $97,000. ODHS further determined that Mrs. Holland's MMMNA was $1230. Mrs. Holland's social security income was $417 per month, and Mr. Holland's social security income was $857 per month.

In Ohio, ODHS, until January 1996, opted to use an income-first approach rather than a resource-first approach.[11] In other words, when a community spouse's income was less than the statutory MMMNA, ODHS required that the institutionalized spouse first transfer any available income to the community spouse to satisfy the MMMNA. ODHS permitted the transfer of resources from the institutionalized spouse to the community spouse only when the income of the community spouse, plus the income of the institutionalized spouse, plus the income generated by the original community spouse resource allowance, did not meet the MMMNA. Under ODHS's income-first interpretation, it was less likely that resources would be transferred to the community spouse, which in turn, left the institutionalized spouse with more available resources and less likely to qualify for Medicaid.[12]

## V.

### A.

■ In the present case, the district court considered whether it was appropriate for ODHS to apply the income-first approach. The district court concluded that it was not, finding that the MCCA mandates a resource-first approach. Accordingly, the district court granted summary judgment in favor of appellees as to this issue. We review a district court's grant of summary judgment,

Using the income-first approach, ODHS determined that Mrs. Holland's MMMNA could be satisfied by transferring Mr. Holland's monthly income to her and thus there was no need to increase her community spouse resource allowance. As a result, Mr. Holland could not transfer resources to Mrs. Holland. Mr. Holland was therefore ineligible for Medicaid, because his resources of $97,000 exceeded the $1500 resource limitation. Under a resource-first approach, on the other hand, Mr. Holland could immediately transfer resources to Mrs. Holland to increase the community spouse resource allocation to whatever amount would generate an additional $813 per month (the difference between $1230 and $417). Even assuming a relatively liberal rate of return, Mr. Holland could most likely transfer the entire $97,000 to Mrs. Holland, which would render him immediately eligible for Medicaid.

which was premised on a question of statutory construction, de novo.[13] *See First City Bank v. National Credit Union Admin. Bd.,* 111 F.3d 433, 436–37 (6th Cir.1997), *cert. denied,* —— U. S. ——, 118 S.Ct. 1162, 140 L.Ed.2d 174 (1998).

 In finding that the MCCA mandates a resource-first approach, the district court adopted the reasoning of two Ohio appellate courts which had addressed this issue and determined that ODHS's use of the income-first approach did not comply with the "plain language" of 42 U.S.C. § 1396r–5. *See Gruber v. Ohio Dep't of Human Servs.,* 98 Ohio App.3d 72, 647 N.E.2d 861 (1994); *Kimnach v. Ohio Dep't of Human Servs.,* 96 Ohio App.3d 640, 645 N.E.2d 825 (1994).[14] Because of its reliance on the plain language of the statute, the district court concluded that it was not required to give deference to ODHS's—or for that matter, HHS's—interpretation of the MCCA. We disagree.

The district court based its decision on what it called a plain reading of the sections of the MCCA dealing with the transfer of resources and the transfer of income. The district court noted that subsection (f) of § 1396r–5 specifically permits the transfer of resources in the form of the community spouse resource allowance. This subsection requires that the transfer of resources occur as soon as practicable after eligibility is determined, but does not prohibit ascertaining the amount of the community spouse resource allowance prior to the eligibility determination.[15] The district court compared this subsection to subsections (b) and (d) of § 1396r–5, which address the transfer of income between spouses. The district court noted that the provisions dealing with the transfer of income are addressed in entirely different subsections from subsection (f). Further, subsections (b) and (d) refer to the transfer of income **after** the eligibility deter-

13. Regardless of whether we consider the district court's July Order as a partial grant of summary judgment or as an injunction, our review of the district court's construction of the MCCA is de novo. *See GTE Mobilnet v. Johnson,* 111 F.3d 469, 474–75 (6th Cir.1997) (" We review de novo questions of law relevant to a district court's grant of a preliminary injunction.")

14. Appellees argue that the doctrine of issue preclusion bars our consideration of the matters raised in this appeal, because of the two prior judgments by the Ohio appellate courts. We recognize that we are required to give the same effect to a state court judgment that would be given by a court of the state in which the judgment was rendered. *See Hapgood v. City of Warren,* 127 F.3d 490, 493 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1361, 140 L.Ed.2d 511 (1998). In Ohio, the general rule is that mutuality of parties is a prerequisite to the offensive use of issue preclusion. *See Goodson v. McDonough Power Equip., Inc.,* 2 Ohio St.3d 193, 443 N.E.2d 978 (1983). Because the parties in the present action are not identical nor in privity with the parties in the prior actions, issue preclusion does not apply here.

In addition, the Supreme Court has held that non-mutual issue preclusion is generally not available against the federal government. *See United States v. Mendoza,* 464 U.S. 154, 158, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). In *Mendoza,* the Court rationalized that allowing non-mutual issue preclusion against the United States would force the Solicitor General to "abandon those prudential concerns and to appeal every decision in order to avoid foreclosing further review." *Id.* at 161, 104 S.Ct. 568. Also, if non-mutual

issue preclusion applied against the United States, the government's ability to develop law by litigating the same issue in several circuits would be inhibited, as well as the Court's practice of waiting for "percolation" through the circuits before granting certiorari. *See id.* at 160, 104 S.Ct. 568.

Although the *Mendoza* rationale has not been definitively extended to apply to state governments, there is support for that proposition. *See Hercules Carriers, Inc. v. Florida,* 768 F.2d 1558, 1579 (11th Cir.1985) (applying *Mendoza* to state governments); *see also Milton S. Kronheim & Co. v. District of Columbia,* 91 F.3d 193, 205 (D.C.Cir.1996) (Silberman, J.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1468, 137 L.Ed.2d 681 (1997). The same considerations set forth in *Mendoza* with respect to the federal government may apply to state governments. The *Mendoza* rationale provides further support for our conclusion that the use of offensive non-mutual issue preclusion is not appropriate *in this case.* While Ohio law is silent in this respect, given its restrictive views on mutuality, we anticipate that the Ohio Supreme Court would not use offensive non-mutual issue preclusion against the state.

15. 42 U.S.C. § 1396r–5(f) states in part:

Permitting transfer of resources to community spouse.

(1) In general.
An institutionalized spouse may . . . transfer an amount equal to the community spouse resource allowance. . . . The transfer under the preceding sentence shall be made as soon as practicable after the date of the initial determination of eligibility. . . .

mination.[16] The district court thus concluded that there is no provision in the statute that permits the transfer of income to the community spouse prior to the eligibility determination, however, the community spouse resource allowance is determined prior to the eligibility determination. Thus, because income cannot be transferred prior to the eligibility determination, the plain meaning of the statute mandates a transfer of resources from the institutionalized spouse to the community spouse when necessary to supplement the community spouse resource allowance.

We disagree with the district court's conclusion that the MCCA mandates a resource-first approach because there is no express provision for the pre-eligibility transfer of income. First, the MCCA does not prohibit the pre-eligibility transfer of income from the institutionalized spouse to the community spouse.[17] Subsections (b) and (d), although not setting forth conditions for the transfer of income prior to the eligibility determination, do not expressly prohibit such a transfer. The better reading of subsections (b) and (d) is that these subsections provide a framework for preserving income for the community spouse by limiting the amount of the eligible institutionalized spouse's income which must be used to pay medical expenses. *See Thomas v. Commissioner*, 425 Mass. 738, 682 N.E.2d 874, 879 (1997) (holding that Massachusetts' income-first approach was a valid interpretation of § 1396r–5).

Moreover, the purpose of the pre-eligibility determination of the community spouse resource allowance is to prevent the depletion of a couple's joint resources in order for the institutionalized spouse to qualify for Medicaid. *See* H.R.Rep. No. 100–105(II), 100th Cong., 2d Sess. at 65 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 888. Because this concern is not relevant on the income side of

the equation, the income allowance need not be determined on a pre-eligibility basis. This distinction between the resource allowance and the income allowance does not, however, address—or limit—the issue of whether a transfer of income may be considered when a community spouse resource allowance adjustment is contemplated under § 1396r–5(e)(2)(C).

Second, the attribution of income provisions upon which the district court relied do not, by their very terms, apply to subsection (e)(2)(C). Those income provisions apply "in determining the income of an institutionalized spouse or community spouse for purposes of the post-eligibility income determination described in subsection (d)." 42 U.S.C. § 1396r–5(b)(2); *see also Cleary v. Waldman*, 959 F.Supp. 222, 232 (D.N.J.1997). Accordingly, subsections (b) and (d) do not provide guidance for the revision of the community spouse resource allowance pursuant to subsection (e)(2)(C).

In light of the foregoing, we cannot say that § 1396r–5(e)(2)(C) has a "plain meaning" that mandates a resource-first approach. The MCCA does not set out a definition of income as that term is used in subsection (e)(2)(c). Further, unlike the district court, we do not read subsections (b), (d)(e) and (f) as imparting a plain meaning that prohibits the transfer of income pre-eligibility, such that transferred income cannot be included in the community spouse's income as that term is used in subsection (e)(2)(C). Instead, we believe that subsection (e)(2)(C)'s reference to "income" is ambiguous at best. Indeed, the differing views of the various courts and agencies that have interpreted subsection (e)(2)(C) provide a strong indication that the subsection is ambiguous. *Compare, e.g., Gruber*, 647 N.E.2d at 861 (holding that MCCA mandates resource-first ap-

---

**16.** 42 U.S.C. § 1396r–5(b)(2) provides in part:
 In determining the income of an institutionalized spouse or community spouse for purposes of the post-eligibility income determination described in subsection (d) ... the following rules apply....
 42 U.S.C. § 1396r–5(d)(1) provides in part:
 After an institutionalized spouse is determined or redetermined to be eligible for medical assistance, in determining the amount of the spouse's income that is to be applied monthly

to payment for the costs of care in the institution, there shall be deducted from the spouse's monthly income the following amounts....

**17.** Although it is true that § 1396r–5(b)(1) provides that "no income of the community spouse shall be deemed available to the institutionalized spouse," there is no corresponding prohibition of attributing the institutionalized spouse's income to the community spouse.

proach in implementing subsection (e)(2)(C)), *and Kimnach,* 645 N.E.2d at 825 (same), *with Cleary,* 959 F.Supp. at 232 (holding that income-first approach is permissible interpretation of MCCA), *and Thomas,* 682 N.E.2d at 879 (same); *see also Smiley v. Citibank,* 517 U.S. 735, 116 S.Ct. 1730, 1732–33, 135 L.Ed.2d 25 (1996) (stating that varying court interpretations indicate that the meaning of a word in a statute is ambiguous).

As stated by the United States Supreme Court, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Likewise, under Ohio law, a state agency's interpretation of a federal statute is given deference so long as the interpretation is reasonable. *See Swallow v. Industrial Comm'n,* 36 Ohio St.3d 55, 521 N.E.2d 778 (1988); *State, ex rel. McLean v. Industrial Comm'n,* 25 Ohio St.3d 90, 495 N.E.2d 370 (1986). Having determined that the MCCA is silent or ambiguous as to the meaning of income in subsection (e)(2)(C), we now turn to whether the interpretations by HHS and ODHS were permissible and reasonable constructions of the statute.

**B.**

With respect to interpretation of the MCCA, HHS has acknowledged that the statute does not clearly express whether states are required to follow the resource-first approach or the income-first approach, a view not formalized in regulation but stated in HHS's policy memoranda and in letters. *See, e.g.,* HCFA, Medicaid Operations Branch, Chicago Regional State Letter No. 22-94 (July 1994). Thus, HHS's position is that states have the option "to use the 'income first' rule or to apply some other reasonable interpretation of the law until we have issued final regulations which specifically address this issue." *Id.* at 2. ODHS, the state agency responsible for administration of the MCCA in Ohio, in turn, adopted an income-first approach until January 1996.

Because HHS has not cemented its interpretation in the form of binding regulations, its interpretation may not be "entitled to *de facto* binding effect through judicial deference." *Management Recruiters Int'l, Inc. v. Bloor,* 129 F.3d 851, 856 (6th Cir.1997). However, given the unique nature of the statute and of HHS's power to interpret it, we believe that courts may give even relatively informal interpretations by HHS some presumption of correctness. *See Schweiker v. Gray Panthers,* 453 U.S. 34, 43, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981) ("Perhaps appreciating the complexity of what it had wrought, Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the [Medicaid] Act." ); *see also Elizabeth Blackwell Health Ctr. for Women v. Knoll,* 61 F.3d 170, 182 (3d Cir.1995) (stating that in interpreting the Medicaid statutes, "deference is appropriate here even though the Secretary's interpretation is not contained in a 'legislative rule' "), *cert. denied,* 516 U.S. 1093, 116 S.Ct. 816, 133 L.Ed.2d 760 (1996).

But even if we give the agency interpretation little deference, because we have concluded that the MCCA is ambiguous as to the issue presented in this case, we must also conclude that the interpretation given it by HHS was a reasonable and permissible interpretation, although not the only possible one. The legislative history of the statute does not indicate the requirement of a single approach to revising the community spouse resource allowance. The initial House bill that became the MCCA did not contain any option for increasing the community spouse resource allowance to meet the monthly needs allowance. *See* H.R.Rep. No. 100–105(II), 100th Cong., 2d Sess. at 70 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 893. The initial Senate bill was modeled after the House bill, but added an important change: it excluded from the institutionalized spouse's countable resources those resources necessary to generate enough income to meet the monthly needs allowance of the community spouse, without regard to any income of the institutionalized spouse that might be transferred to the community spouse, or in other words, a resource-first approach. *See* H.R. Conf. Report No. 100–661, 100th Cong., 2d Sess. at

**804**

263 (1988), *reprinted in* 1988 U.S.C.C.A.N. at 1041. However, the Conference Committee adopted neither the House nor the Senate versions of the bill. *See* H.R. Conf. Rep. No. 661, 100th Cong., 2d Sess. at 265 (1988), *reprinted in* 1988 U.S.C.C.A.N. at 1035–47. Unlike the House version, the version adopted by the Conference Committee provided for an adjustment to the community spouse resource allowance if necessary to increase the community spouse's income to meet the monthly needs allowance. But, unlike the Senate version, the Conference Committee version did not achieve the result through a reallocation of resources. Instead, it established the administrative hearing process set out in § 1396r–5(e)(2)(C).

The Conference Committee specifically chose not to adopt the resource-first approach as proposed by the Senate. The legislative history thus suggests a congressional intent for the revision of the community spouse resource allocation to take place either by the application of the income-first rule, or by allowing state agencies discretion to apply their choice of the income-first or the resource-first rule. As previously stated, HHS's position is that Congress has given the states discretion to determine whether to apply the income-first or the resource-first approach. The approach set forth by HHS, and reflected in ODHS's application of the statute, therefore complies with the legislative intent of the MCCA. Further, the policy objectives of the MCCA—to ensure that a community spouse will have an adequate but not excessive amount of available income and resources while the institutionalized spouse is in a nursing home at Medicaid expense—are met by HHS's interpretation.

We believe both the ODHS interpretation of the MCCA and its decision to apply an income-first approach until 1996 were reasonable and permissible. Other courts have endorsed this approach as compatible with the MCCA. *See, e.g., Cleary,* 959 F.Supp. at 232; *Thomas,* 682 N.E.2d at 879. In addition, ODHS's approach has a sound basis in the guiding legislative goals and policy considerations of the MCCA. We therefore **REVERSE** the judgment of the district court, in which the district court found that the

MCCA mandates a resource-first approach, and **REMAND** for further proceedings consistent with this opinion.

## VI.

In its December 14th injunction, the district court ordered ODHS to notify the five subclasses that were affected by the July Order that they may be eligible for Medicaid benefits and that there may be other relief to which they are entitled under state law. In light of our decision reversing the July Order, there is no need for the notification of the five subclasses; accordingly, we **RE-VERSE** the district court's December Injunction requiring notice to be sent to the five subclasses.

## VII.

For the foregoing reasons, we **REVERSE** the July 13, 1995 and the December 14, 1995 judgments of the district court, and **RE-MAND** this case to that court for further proceedings consistent with this opinion.